**GRANITE PARTNERS, L.P., Granite Corporation and Quartz Hedge Fund, by and through the Litigation Advisory Board of Granite Partners, L.P., Granite Corporation and Quartz Hedge Fund, Plaintiffs,**

v.

**BEAR, STEARNS & CO. INC., Bear, Stearns Capital Markets Inc., Howard Rubin, Donaldson, Lufkin & Jenrette Securities Corporation, Elizabeth Comerford and Merrill Lynch, Pierce, Fenner & Smith Incorporated, Defendants.**

**No. 96 Civ. 7874(RWS).**

United States District Court,
S.D. New York.

Aug. 25, 1998.

Friedman Kaplan & Seiler, New York City (Robert D. Kaplan, Eric Seiler, Robert J. Lack, Robert S. Loigman, Nicole L. Gueron, of counsel), Berlack, Israels & Liberman, New York City (Steven E. Greenbaum, Edward S. Weisfelner, John P. Biedermann, Anne M. Cunningham, of counsel), for plaintiffs.

Fried, Frank, Harris, Shriver & Jacobson, New York City (David M. Morris, Albert Shemmy Mishaan, of counsel), for Bear Stearns & Co. Inc., Bear Stearns Capital Markets Inc. and Howard Rubin.

Morgan, Lewis & Bockius, New York City (Catherine A. Ludden, Gary G. Staab, Scott S. Balber, Maureen C. Weiss, of counsel), for Donaldson, Lufkin & Jenrette Securities Corp.

Brown & Wood, New York City (A. Robert Pietrzak, William M. Goldman, Elizabeth Storch, Rick B. Antonoff, of counsel), for Merrill Lynch, Pierce, Fenner & Smith Inc.

Hahn & Hessen, New York City (Jeffrey L. Schwartz, Howard Ruda, Jaime E. Kriss, of counsel), for The Bond Market Association.

## OPINION

SWEET, District Judge.

Defendants Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ"), Bear, Stearns & Co. Inc., Bear, Stearns Capital Markets Inc. (collectively, "Bear Stearns"), Howard Rubin ("Rubin"), and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") (together with DLJ, Bear Stearns, and Rubin, the "Brokers") have moved for partial dismissal of the First Amended Complaint ("Complaint") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted and for failure to plead fraud with particularity. Specifically, the Brokers move to dismiss the following claims against them: (1) inducing and participating in breach of fiduciary duty (Count I), (2) tortious interference with contract (Counts II, XII, and XXI, which is against Merrill Lynch), (3) rescission of unauthorized trades (Count III), (4) breach of duty due to wrongful margin calls and liquidation (Count V), (5) conversion (Count VI), (6) violations of the Sherman and Donnelly Acts (Counts VII and VIII), (7) *prima facie* tort against Bear Stearns (Count IX), (8) breach of contract due to commercially unreasonable liquidations (Count X), (9) breach of duty to liquidate in a commercially reasonable manner (Count XI), (10) common law fraud (Count XIII), (11) negligent misrepresentation (Count XIV), (12) innocent misrepresentation (Count XV), (13) breach of express warranty (Count XVI), (14) unjust enrichment (Count XVII), and (15) equitable subordination (Count XX).

For the reasons set forth below, the Brokers' motion will be granted in part and denied in part.

### Parties

Plaintiff Granite Partners, L.P. ("Granite Partners"), a Delaware limited partnership, was established in January 1990 as an investment fund to invest primarily in mortgage-related securities on behalf of individuals and entities subject to United States taxation.

Plaintiff Granite Corporation ("Granite Corp."), a Cayman Islands corporation, was organized in January 1990 to invest primarily in mortgage-backed securities on behalf of offshore investors and domestic tax-exempt entities, including foundations and pension funds.

Plaintiff Quartz Hedge Fund ("Quartz") (collectively with Granite Partners and Granite Corp., the "Funds"), a Cayman Islands corporation, was established in January 1994 as a vehicle to invest primarily in mortgage-related securities on behalf of offshore investors and others exempt from United States taxation.

The Funds bring this action by and through the Litigation Advisory Board (the "LAB"), which was given the exclusive authority on behalf of and in the name of the Funds' estates to commence, prosecute, settle, or otherwise resolve all unresolved claims and causes of action of the Funds' estates by order of the United States Bankruptcy Court for the Southern District of New York.

DLJ, Bear Stearns, and Merrill Lynch, all Delaware corporations with their principal places of business in New York City, are broker-dealers that transacted business with the Funds.

Rubin, a resident of New Jersey, was at all relevant times a senior managing director and the head CMO trader at Bear Stearns.

### Relevant Nonparties

At all relevant times to this action, nonparty Askin Capital Management, L.P. ("ACM"), a Delaware limited partnership, was a registered investment advisor, whose exclusive place of business was New York City. ACM was, at all relevant times, controlled by nonparty David J. Askin ("Askin"), who owned and controlled ACM's sole general partner, Dashtar Corporation. Askin also served as ACM's sole limited partner, president, chief executive officer, and chief financial officer. ACM became the investment advisor to Quartz since its formation.

### Prior Proceedings

On April 7, 1994, the Funds filed petitions for relief under chapter 11 of the United States Bankruptcy Code. The chapter 11 trustee for the Funds (the "Trustee") initially filed this action in the United States Bankruptcy Court for the Southern District of New York on September 12, 1996. The case was referred to this Court on October 18, 1996. On consent, this Court withdrew the reference from the Bankruptcy Court on December 3, 1966.

On January 27, 1997, the Trustee submitted a Third Amended Joint Plan of Liquidation for the Funds (the "Plan"). Following the Bankruptcy Court's confirmation of the chapter 11 Plan on March 2, 1997, this action has been pursued by the LAB, appointed pursuant to the Liquidation Plan.

The LAB filed the Complaint in this action on August 4, 1997, naming, in addition to Bear Stearns, Rubin, DLJ, and Merrill Lynch as defendants.

In the Complaint, the LAB asserts the following claims: breach of contract, inducing and participating in breach of fiduciary duty, tortious interference with contracts, rescission of unauthorized trades, breach of duty, conversion, federal and state antitrust violations, *prima facie* tort, common law fraud, negligent and innocent misrepresentation, breach of express warranty, unjust enrichment, objection to claims and interest, and equitable subordination.

Merrill Lynch and DLJ filed their motions to dismiss on November 10, 1997, and Bear Stearns filed its motion on November 12, 1997. Oral argument was heard on May 20, 1998, at which time the motions were deemed fully submitted.

On March 24, 1998, the Bond Market Association (the "BMA") moved for leave to file a memorandum of points and authorities as *amicus curiae* for the purpose of bringing to the Court's attention its views regarding the

treatment of repurchase agreements ("repos") under the applicable state law and informing the Court of the importance of repos to the debt capital markets. · The motion was granted on May 20, 1998.

*Facts*

In considering a motion to dismiss, the facts alleged in the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken primarily from the LAB's Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion.

This case arises out of the collapse in early 1994 of the Funds that were managed by Askin and ACM. The major claims brought in this lawsuit fall into two categories: (1) that the Brokers injured the Funds by selling to them inappropriate securities purchased by Askin and ACM, and (2) that the Brokers injured the Funds by making improper margin calls and liquidating the Funds' reverse repurchase positions when the margin calls were not satisfied.

The Funds invested primarily in collateralized mortgage obligations ("CMOs") created by the Brokers and other broker-dealers. ACM, through its president, Askin, purchased the securities for the Funds. The Brokers are alleged to be "among the principal sellers of CMOs to the Funds." (Compl. ¶ 4.)

CMOs are bonds created from and collateralized by mortgage-backed securities formed from pools of residential mortgages or securities backed by such mortgages. They are divided into various classes, or "tranches," each of which is entitled to a different portion of the principal and/or interest payments made by the underlying mortgage obligors. The tranches differ from one another with respect to their sensitivity to interest rate changes and the certainty with which their reaction to such changes can be predicted. The Brokers referred to the riskiest tranches—those most prone to large and unpredictable swings in value—as "toxic" or "nuclear waste."

The two larger Funds, Granite Partners and Granite Corp., were designed to invest in "market-neutral" portfolios of high-quality CMOs. They were intended to acquire balanced holdings of "bullish" bonds and "bearish" bonds. A bullish security is likely to increase in value when interest rates fall and decrease in value when interest rates rise. A bearish security is likely to decrease in value when interest rates fall and increase in value when interest rates rise. By purchasing offsetting positions in predictable securities, the Funds would enjoy the high returns associated with rate-sensitive CMOs while hedging against the risk attendant upon interest rate flucuations. Quartz was intended to be "market-directional"—to maintain a bullish or bearish portfolio depending on the predicted direction of interest rates.

Askin and ACM, the Funds' investment advisor, had fiduciary and contractual duties to the Funds to make investments with due care and in accordance with the Funds' stated investment objectives. ACM was to accomplish these respective goals by rigorously and continuously analyzing each proposed acquisition for each Fund with a sophisticated, proprietary computer model that would allow ACM and Askin to determine the impact of interest rate changes on the price and value of each bond.

Askin and ACM, however, managed the Funds negligently and repeatedly breached their contractual and fiduciary duties. They did not perform a rigorous analysis of the securities they bought, and they were unable to gauge how those securities would respond to interest rate movements. Moreover, they did not use, or even have, sophisticated computerized analytical techniques. In fact, "ACM and Askin often made purchase decisions based on little or no ·analysis or research. They instead relied on Broker recommendations, representations, valuations, and reports, Askin's 'instincts,' and unsophisticated analysis to select the Funds' securi-

ties." (Compl. ¶ 70.) As a result, ACM and Askin failed to create market-neutral portfolios for Granite Partners and Granite Corp., instead creating portfolios that were dramatically bullish, and that contained a number of highly volatile, unpredictable, toxic CMOs. Similarly, at the time when Askin believed that interest rates would rise, he constructed an inappropriate bullish portfolio for Quartz.

The Complaint alleges that throughout 1993 and early 1994, the Brokers took advantage of Askin's shortcomings. Although they knew of Askin's obligation to create market-neutral portfolios for Granite Partners and Granite Corp., knew of Askin's inability to analyze the impact of interest rate changes on esoteric CMO tranches, and knew of the Funds' dangerous bullish tilt, the brokers induced Askin to buy inappropriate, toxic, bullish CMOs that eroded in value when short-term interest rates rose in early 1994. For example, from January 1993 to February 1994, the Brokers sold the Funds $34 million in bearish CMOs but $740 million in inappropriate securities. The Complaint maintains that the Brokers misrepresented many of these strongly bullish and toxic securities as bearish or only slightly bullish.

The Brokers sold these toxic and inappropriate securities to the Funds because it was profitable for them to do so. The sale of the toxic tranches of a CMO offering makes the entire offering economically feasible. The Brokers are committed to buying any unsold tranches for their own accounts, and they do not wish to own nuclear waste themselves. Accordingly, they are unwilling to market a new offering unless they are assured they will be able to sell the toxic securities. For this reason, the toxic tranches are referred to as the "deal drivers."

To generate demand for the more volatile tranches of their CMO offerings, the Brokers cultivated relationships with a small number of managers of investment funds, including ACM. They steered investors to ACM to enable ACM to purchase the more volatile, esoteric CMOs from the Brokers and grant-ed AMC extensive credit (at times in violation of their own internal credit guidelines) to increase the amount of such CMOs that ACM could purchase. ACM, acting on the Funds' behalf, became one of the largest volume purchasers of these volatile and esoteric tranches from the Brokers. In early 1994, the Funds owned, in the aggregate, more than $1.5 billion of such CMOs, approximately half of which were purchased from the three Brokers (and another quarter from Kidder, Peabody & Co. Inc. ("Kidder")). In short, the Brokers all were "in bed" with ACM. (Compl. ¶ 40.)

As a result of the Brokers' sales of numerous inappropriate securities to the Funds, by the beginning of 1994 the Funds' portfolios were dangerously "tilted" in a way that exposed the Funds to substantial losses in the event of an increase in interest rates. When interest rates rose in February and March 1994, the Funds experienced an erosion in value. In March 1994, the Brokers issued improper margin calls on the Funds, based on arbitrary security valuations.

The Funds acquired most of their securities pursuant to repos, a financing mechanism that allowed the Funds to pay only a fraction of the cost of each CMO in cash, borrowing the balance from the Brokers. In such a transaction, one party to the agreement agrees to sell a security to a buyer/lender for a given sum (the "repo amount") and to buy the security back from the buyer/lender at a later date (the "buyback date") for the repo amount plus a market rate of interest (the "repo rate"). In effect, the Complaint alleges that the repos were collateralized loans—the Brokers loaned the Funds most of the purchase price for each CMO and took possession of the bonds as collateral. The use of repos benefitted the Brokers, allowing the Funds to increase their purchases from the Brokers.

The contracts between the Funds and the Brokers[1] allowed the Brokers to make margin calls on the Funds if the value of the

---

1. Each of the Funds entered into a Public Securities Association Master Repurchase Agreement ("PSA Agreement") with Bear Stearns and DLJ. Merrill Lynch entered into a PSA Agreement with Quartz, but not with Granite Partners or Granite Corp. In connection with its repurchase transactions with those funds, Merrill Lynch issued trade confirmations that purported to grant Merrill Lynch a security interest in the repoed securities.

securities on repo fell below the amount that the Funds had borrowed (plus an agreed-upon "haircut"). In that instance, a "margin deficit" exists. In making margin calculations, the market value of the securities must be the price obtained from a "generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source," plus accrued income not included therein. (Compl. ¶ 55.) In March 1994, however, the Brokers issued a blizzard of margin calls that were not based on fair market prices, but on unreasonably low, manipulated valuations.

When the Funds were unable to meet the Brokers' improper margin calls, the Brokers liquidated the Funds' portfolios. Under the PSA Agreements, if a proper margin call is not met, the broker-dealer may liquidate the collateral upon one business day's notice, including by selling the securities to itself in a "deemed" sale and crediting the customer in an amount equal to the price of the securities obtained from a general recognized source or the most recent closing bid quotation from such a source. According to the Complaint, the liquidations were not conducted in good faith and in a commercially reasonable manner. Instead of seeking to maximize the prices paid for the Funds' securities in the liquidations by soliciting bids from their retail customers, the Brokers in nearly all cases simply "deemed" the CMOs sold to themselves, at unreasonably low prices.

The Brokers agreed to facilitate each other's liquidations by providing each Broker with sham bids for the Fund securities that each of them held. These were not *bona fide* offers to purchase the securities at market prices, but artificially low "accommodation" bids solicited and provided in an effort to justify the prices at which the Brokers then deemed the Funds' CMOs sold to themselves.

The Complaint alleges that by selling the inappropriate toxic securities to the Funds, by generating artificial and improper margin calls, and then by liquidating the portfolios in a commercially unreasonable and collusive manner, the Brokers netted profits, whereas the Funds lost more than $400 million.

## Discussion

### I. Legal Standards

#### A. Rule 12(b)(6)

In deciding the merits of a motion to dismiss for failure to state a claim, all material allegations composing the factual predicate of the action are taken as true, for the court's task is to "assess the legal feasibility of the complaint, not assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (*quoting Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)). Thus, where it is beyond doubt that plaintiff can prove no set of facts in support of his or her claim which would warrant relief, the motion for judgment on the pleadings must be granted. *See H.J. Inc. v. Northwestern Bell Tel., Co.,* 492 U.S. 229, 250, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Additionally, on a Rule 12(b)(6) motion, consideration is limited to the factual allegations in the complaint, "to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff'[s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *see Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir. 1991).

#### B. Rule 9(b)

Federal Rules of Civil Procedure 9(b) requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 265 (2d Cir.1993); *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444–45 (2d Cir.1971). The pleading must be sufficiently particular to serve the three goals of Rule 9(b), which are (1) to

provide a defendant with fair notice of the claims against him; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See Di-Vittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd,* 936 F.2d 674 (2d Cir. 1991).

The Court of Appeals has required that allegations of fraud adequately specify the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them. *See McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir. 1992); *Cosmas,* 886 F.2d at 11.

■ The pleading must give notice to each opposing party of its alleged misconduct. Thus, a claim may not rely upon blanket references to acts or omissions by all the defendants, for each defendant named is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he is individually charged. *See Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 n.7 (S.D.N.Y.1977). This requirement facilitates the preparation of an adequate defense while protecting a party's reputation from a groundless accusations. *See de Atucha v. Hunt,* 128 F.R.D. 187, 189 (S.D.N.Y.1989), aff'd, 979 F.2d 846 (2d Cir. 1992); *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir.1982). It also serves to prevent abuse of process and gratuitous disruption of normal business activity. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 740–41, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

## II. Count XIII Alleging Common Law Fraud Against the Brokers Is Dismissed

■ There are five elements necessary to sustain a claim of fraud under New York law: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance. *May Dep't Stores Co. v. International Leasing Corp.,* 1 F.3d 138, 141 (2d Cir.1993); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987); *Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F.Supp. 576, 584 (S.D.N.Y.1995). Additionally, the plaintiff must comply with the heightened pleading standard of Rule 9(b), Fed.R.Civ.P.

The Complaint alleges that, to sell the Funds the toxic, "deal driver" tranches of their CMO offerings, the Brokers misrepresented certain securities, particularly inverse IOs,[2] as bearish or only slightly bullish when, in fact, they were strongly bullish or their reaction to interest rate changes was impossible to predict. In reliance on the Brokers' misrepresentations, the Funds purchased securities that they would not otherwise have, and they held onto securities that they would otherwise have sold.

Because some of the allegations do not meet the requirement of Rule 9(b), and the remaining fail to adequately allege justifiable reliance, the fraud claim must be dismissed.

### A. Allegations of Fraud Specific to Bear Stearns Do Not Meet the Pleading Requirements of Rule 9(b)

■ There are three fraudulent allegations set forth in the Complaint particular to Bear Stearns. Because they do not comply

---

**2.** One of the tranches of CMOs is the inverse IO. The response of inverse IOs to changes in interest rates is difficult to predict. For example, an increase in short-term rates would lead to a decrease in the coupon rate paid on an inverse IO whose coupon rate formula was based on LIBOR. The Complaint states that the decrease could be dramatic if leverage was involved. The decrease in the coupon rate on the inverse IO would tend to depress its value. If, however, the increase in short-term rates was accompanied by an increase in long-term rates, prepayments might decline, extending the payment stream on the inverse IO. This would tend to increase its value, perhaps enough to offset the decline in value caused by the reduction in the coupon rate. The difficulty in predicting the impact of interest rate changes on inverse IOs makes them risky securities. Inverse IOs are particularly toxic when they are leveraged. (Compl.¶ 32.)

with Rule 9(b), Bear Stearns' motion to dismiss is granted.

The LAB invokes the deposition testimony of Askin in another matter as one of its allegations of fraud against Bear Stearns. Askin testified at a January 5, 1995, deposition:

A: It's also not my testimony that each inverse IO shown to ACM by any or all dealers were bearish, but rather that some of the inverse IOs that were represented to ACM by some of the dealers were represented as bearish securities.

Q: Was Kidder, Peabody one of the brokers who misrepresented an inverse IO as bearish?

A: Kidder Peabody is one of the brokers that on more than one occasion represented that the inverse IOs that it wanted to sell were bearish . . . .

Q: Does your last answer apply to Bear Stearns as well?

A: I believe it does, yes.

(Compl. ¶ 77.)

This exchange lacks the specificity required under Rule 9(b). It not only fails to allege a statement by Bear Stearns, but it also fails to state the time and place the statement was made, as well as the identification of the speaker. *See Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 123 (S.D.N.Y.1997). Such a vague reference cannot form the basis for a fraud claim under Rule 9(b).

The LAB also alleges that on March 31, 1993, "Bear Stearns faxed marketing materials to ACM indicating that four inverse IO residual CMOs were '1000 basis points cheap to benchmark I/Os' and that these same bonds were '25% cheaper than Trust IOs.'" (Compl. ¶ 79.) The same fax allegedly included the sentence, "I would suggest a smaller long position (as the off-setting hedge) than we have been using in the IO analysis." (*Id.*) The LAB contends that upon translation of the broker's jargon Bear Stearns is representing that the four inverse

IOs are less expensive substitutes for benchmark and Trust IOs, both well known to be bearish securities. According to the LAB, these statements mean that Bear Stearns advised ACM to purchase these securities as a hedge against Granite Corp. and Granite Partners' bullish securities.

Whereas the LAB maintains that Bear Stearns made a representation about the fundamental properties of inverse IOs upon which the Funds relied to their detriment, Bear Stearns asserts that the statements in the fax do not constitute a "representation" at all, much less a "misrepresentation" that certain securities are bearish. The first portion of the alleged statement, maintains Bear Stearns, is a relative price quotation, and the second part is, by its own terms, a suggestion—a statement of opinion.

The plain words of the allegation do not support the LAB's contention. The first portion of the fax states that four particular bonds are cheaper than certain other classes of bonds. The LAB does not claim that the statement was false—that the bonds were not, in fact, cheaper than the other classes of bonds. Instead, the LAB explains that this was a misrepresentation about the fundamental characteristics of these four securities. This is not a reasonable inference to be drawn in the LAB's favor since it requires the Court to take words that are concededly accurate and interpret them into a misrepresentation. *See Cohen v. Litt*, 906 F.Supp. 957, 961 (S.D.N.Y.1995) ("In evaluating a motion to dismiss, a court need not accept a complaint's legal conclusions and unwarranted factual deductions.").

The second portion of the fax is, as stated by Bear Stearns, a suggestion rather than a representation of fact. *See Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 927 F.Supp. 650, 661 (S.D.N.Y.1996) (finding that "statements cannot support a fraud claim as a matter of law because they were simply not representations of fact"), *aff'd*, 119 F.3d 91 (2d Cir.1997).[3] Additionally, the alleged statement does not indicate the type of secu-

---

3. Bear Stearns notes that if the suggestion implies anything, it is that the four bonds are more bullish than the other classes of securities, not that they were more bearish, since the suggested hedge is to be smaller.

rity the suggested "offsetting hedge" would be. Because there can be no fraud without a misrepresentation, see *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1044 (2d Cir.1986), this allegation cannot form the basis for fraud against Bear Stearns.[4]

■ Finally, the LAB alleges on information and belief that Bear Stearns described one of the forwards [5] as bearish in order to induce ACM to purchase it. Yet "[f]raud pleadings generally cannot be based on information and belief." *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.1988). The exception to this rule is that "fraud allegations may be so pleaded as to facts peculiarly within the opposing party's knowledge; even then, however, the allegations must be accompanied by a statement of facts upon which the belief is founded." *Id.; see Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 664 (2d Cir.1997); *see also Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) ("This exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specification facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard.").

The LAB represents that its basis for belief is that Bear Stearns described the identical security as bearish in written marketing materials faxed to the Clinton Group, another purchaser of CMOs. However, an alleged statement by Bear Stearns to a third party unrelated to the Funds cannot form the basis for LAB's fraud claim. It is nowhere alleged that the Funds ever heard or relied on this alleged misrepresentation, nor that the same representation was ever made to them. Furthermore, this specific allegation is not "peculiarly" within the defendant's knowledge,

as it must for a fraud pleading premised on "information and belief," see *Campaniello Imports, Ltd.,* 117 F.3d at 664, because the LAB must allege that the Funds heard it and relied on it. Thus allegation must also be dismissed for failure to meet the specificity required by Rule 9(b).

## B. *The Fraud Claim Against the Brokers Will Be Dismissed Because the Lab Has Not Adequately Pleaded Reasonable Reliance*

■ Under New York law, the LAB must establish actual, direct reliance upon the representations of bearishness made by the Brokers. *See Golden Budha Corp. v. Canadian Land Co.,* 931 F.2d 196, 202 (2d Cir.1991); *Belin v. Weissler,* No. 97 Civ. 8787, 1998 WL 391114, at *5 (S.D.N.Y. July 14, 1998); *Turtur v. Rothschild Registry Int'l, Inc.,* No. 92 Civ. 8710, 1993 WL 338205, at *6 (S.D.N.Y. Aug.27, 1993); *Devaney v. Chester,* 709 F.Supp. 1255, 1264 (S.D.N.Y. 1989). Once allegations of actual, direct reliance are adequately pleaded, the inquiry does not stop there. Under New York law, "the asserted reliance must be found to be justifiable under all the circumstances before a complaint can be found to state a cause of action in fraud." *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 322, 157 N.E.2d 597, 599–600, 184 N.Y.S.2d 599, 603 (1959); *see Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1541 (2d Cir.) (stating that "in order to sustain a claim of fraud, a party must establish, *inter alia,* justifiable reliance"), *cert. denied,* —— U.S. ——, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997); *Palmadessa,* 874 F.Supp. at 588 (dismissing common law fraud claim in part because plaintiff failed to show that "he was justified in taking action in reliance" upon defendant's representations).

---

4. This allegation, if it were a proper misrepresentation, would nonetheless fail for inadequately pleading reasonable reliance, as discussed below.

5. In addition to buying on repo, ACM also purchased CMOs for the Funds on a forward-settling basis, *i.e.,* for settlement (payment by the Funds) in the future. In the CMO market, broker-dealers attempt to "pre-sell" certain tranches of CMOs before the CMO has been issued and set-

tled. Frequently, these so-called "forwards" do not settle until several weeks or months after the buyer has committed to purchase them. The length of this lead time arises from the need of broker-dealers to assemble the collateral for and pre-sell much of the CMO deal, which may involve numerous adjustments to the very complex, multitranche structures.

As against DLJ, the LAB asserts as an allegation of fraud that on February 1, 1994, DLJ's salesperson represented that "an inverse IO being offered by DLJ, GECMS 1993 16–A6, was 'a good bearish bond.'" (Compl. ¶ 82.) However, the LAB concedes that the Funds never purchased that security. Thus, the LAB has failed to allege actual, direct reliance upon this representation of bearishness.

Also regarding DLJ, the LAB alleges that in September 1993, DLJ provided the Funds with a portfolio valuation analysis stating that three inverse IOs had a negative effective duration—as per the LAB, an explicit representation that they were bearish; this proved to be false in March 1994 when, in a rising interest rate environment, DLJ marked each of these securities down from 40 to 61%. (*Id.* ¶¶ 105, 110). Similarly, as against all of the Brokers, the LAB maintains that at the end of February 1994, each of the Brokers ascribed values—or "marks"—to the Funds' inverse IOs. The LAB contends that the marks were tantamount to a misrepresentation that those securities were bearish or only slightly bullish when they were actually very bullish or unpredictable. In purported reliance on such representations, the LAB claims that the Funds retained the securities rather than selling them and subsequently purchased other, unidentified, securities. As to these allegations, the Funds' reliance was neither justified nor reasonable.

Before reaching the issue of justifiable reliance, the question of whether the marks constitute representations as to bearishness must be addressed. According to the Brokers, the LAB does not allege that any of the February marks were incorrect, much less fraudulently made. Rather, the LAB claims that the manner in which the prices changed from one month to another constituted a representation about the characteristics of the securities. The Brokers continue that the LAB is engaging in an Alice–in–Wonderland effort to create representations where none exist, for the February marks—simple price quotations without explanation for all of the bonds the Funds had with the Brokers—simply do not constitute representations as

to bearishness. The marks were nothing more than the Brokers' valuation of the securities at that time, in the context of existing market conditions. Indeed, the LAB never alleges in the Complaint that the Brokers actually described any of these bonds as bullish or bearish—in other words, the Brokers never used the terms "bearish" or "bullish" in describing the bonds.

On the other hand, the LAB urges that the marks ascribed to the securities at the end of February constituted strong representations of bearishness because at the time of rising interest rates, the Brokers marked the securities as higher in value, or only slightly lower, than the previous month. As per the LAB, the marks were representations that these securities were in fact bearish or only slightly bullish. The LAB further contends that a month later, in March 1994, the representations were proven false when, with interest rates still rising, the Brokers lowered their marks for the same bonds, triggering the margin calls and liquidations that wiped out the Funds. Moreover, contends the LAB, because interest rates rose both in February and March, there was no economic or "market" basis for the Brokers' inconsistent approach to valuing these inverse IOs.

Because of the subsequent valuations in March, the LAB infers that the February marks were a misrepresentation of bearishness. However, as DLJ points out, the marks only indicate that the Brokers valued these securities at a certain price in February 1994 and that this valuation was lower—after a sea change in the market—in March 1994.

The LAB's allegation that the marks were affirmative representations of bearishness is debatable. Regardless, the fraud claim fails because if misrepresentations of bearishness were made, the LAB's reliance on them was neither justified nor reasonable as a matter of law.

 Under New York law, a party entering into a transaction has a duty to conduct an independent appraisal of the risk it is assuming and a duty to investigate the nature of its business transactions. *See Abrahami v. UPC Constr. Co. Inc.*, 224 A.D.2d 231, 234, 638 N.Y.S.2d 11, 14 (1st Dep't 1996);

*see also Belin,* 1998 WL 391114, at *5–*8. In evaluating whether a plaintiff has adequately alleged justifiable reliance, a court may consider, *inter alia,* the plaintiff's sophistication and expertise in finance, the existence of a fiduciary relationship, and whether the plaintiff initiated the transaction. *See Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1032 (2d Cir.1993).

The Second Circuit addressed the requirement for reasonable reliance in *Lazard Freres,* 108 F.3d at 1542–43. The defendant in that case asserted as an affirmative defense to the plaintiff's breach of contract claim that it reasonably relied upon plaintiff's characterization of the contents of a report that defendant considered material to its decision to enter into a deal. *Id.* Defendant further claimed that plaintiff had structured the deal in such a way that defendant had to rely on plaintiff's characterization and commit to the deal before it had the opportunity to review the report itself. *Id.* at 1543. In fact, defendant alleged that it was forced to rely on plaintiff's representations or lose the chance to be a part of the transaction. Nonetheless, the Second Circuit found that the defendant in *Lazard Freres* "was under a further duty to protect itself from misrepresentation." *Id.*

*Lazard Freres* imposes a duty on sophisticated investors to obtain documentation of information material to their investment decisions. *Id.* As the court proclaimed, " '[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information, but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.' " *Id.* at 1541 (*quoting Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984)).

In evaluating the characteristics of complex derivative securities, DLJ maintains that no reasonable investor could rely solely on short-hand phrases like "bullish" or "bear-

ish," or month-end valuations or portfolio analyses made after the purchase without conducting some independent due diligence.[6] Furthermore, the Funds cannot allege justifiable reliance in light of their representations that Askin and ACM—their sole decisionmakers—were sophisticated and experienced investors.

The LAB, however, states that Askin lacked the tools to model CMOs and to determine their response to interest rate changes and that Askin relied on the Brokers for that information; therefore, the extent of Askin's ability to determine the performance characteristics of the esoteric CMO tranches he was buying, and the reasonableness of his reliance on the Brokers in light of that ability, present fact questions that cannot be resolved in the instant motion.

■ Although the reasonableness of a plaintiff's reliance certainly can be, and often is, a factual issue, whether a plaintiff has adequately pleaded justifiable reliance is a proper subject for a motion to dismiss. *See Brown,* 991 F.2d at 1032–33 (affirming the district court's dismissal of plaintiffs' common law fraud claim, holding that plaintiffs failed to plead justifiable reliance as a matter of law); *Independent Order of Foresters,* 919 F.Supp. at 154 (dismissing plaintiff's fraud claim, holding that the plaintiff alleged reliance on statements in defendant's sales brochure was unreasonable as a matter of law). Indeed, the LAB does not contend that the Funds' receipt of the Brokers' valuation of securities in February 1994 satisfied the Funds' duty to conduct some independent due diligence.

Justifiable reliance is insufficiently pleaded. The LAB cannot use Askin and ACM's breach of duty to shift the responsibility for properly managing the Funds to the Brokers. As the Complaint states, it was the duty of Askin and ACM "to predict correctly a CMO's response to changes in interest

---

**6.** *See generally Independent Order of Foresters v. Donaldson, Lufkin & Jenrette Inc.,* 919 F.Supp. 149, 154 (S.D.N.Y.1996) (dismissing plaintiff's complaint and holding as a matter of law that no reasonable investor, trading millions of dollars in CMOs, would rely on information in a sales brochure in light of the volumes of other informa-

tion available in highly regulated securities transactions); *McCoy v. Goldberg,* 883 F.Supp. 927, 936 (S.D.N.Y.1995) (dismissing complaint for failure to establish justifiable reliance where plaintiffs ignored information in prospectus and instead relied on information in summaries).

rates—that is, to determine accurately whether the CMO would perform bullishly or bearishly—and then to have an appropriate balance of bullish and bearish securities or (in the case of Quartz) an appropriately directional portfolio." (Compl. ¶ 46.) Askin and ACM "had committed themselves to making extensive use of proprietary computerized models to analyze CMOs by modeling cash flows, prepayment expectations, and yields across numerous interest rate scenarios." (Id. ¶ 67.)

Askin and ACM were not novices. They cannot be held to the standard of an ordinary investor in terms of the type and amount of diligence that would be expected prior to making a purchase or investment. Indeed, the Funds collectively possessed close to $400 million in assets in March 1994, and Askin and ACM were their sole advisors. Accepting as true the LAB's allegation that ACM could not effectively model the CMOs, ACM was nonetheless bound by its contractual and fiduciary duties to the Funds to analyze the securities it purchased, and it had the means to hire someone to perform the necessary analysis if it could not. Additionally, the Complaint itself asserts that Askin and ACM based purchasing decisions on little or no analysis and research, but instead relied on Broker "recommendations, representations, valuations, and reports, Askin's 'instincts,' and unsophisticated analyses to select the Funds' securities." (Id. ¶ 70.) The lack of due diligence and investigation on Askin's part belies any representation that Askin's reliance on the February marks or DLJ's September 1993 valuation was justifiable or reasonable. Moreover, there is no allegation of the existence of a special or fiduciary relationship between the Brokers and the Funds such that wholesale reliance on the Brokers would border on reasonable. Thus, the fraud claim against the brokers is dismissed.[7]

### III. Courts XIV and XV for Negligent and Innocent Misrepresentation Are Precluded By the Martin Act

■ New York's Martin Act, N.Y.Gen. Bus.Law, art 23–A, §§ 352 et seq., governs fraud and deception in the sale of securities. It provides for the attorney general to regulate and enforce New York's securities laws. It is well established that there exists no private right of action for claims that are within the purview of the Martin Act. See, e.g., Vannest v. Sage, Rutty & Co., Inc., 960 F.Supp. 651, 657 n. 6 (W.D.N.Y.1997); Independent Order of Foresters, 919 F.Supp. at 153; CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 276, 514 N.E.2d 116, 519 N.Y.S.2d 804, 807 (1987); Rego Park Gardens Owners v. Rego Park Gardens Assocs., 191 A.D.2d 621, 595 N.Y.S.2d 492 (2d Dep't 1993). Thus courts have dismissed state law claims "covered" by the Martin Act on the grounds that permitting them to proceed "would be equivalent to permitting a private claim" under the Act. Vannest, 960 F.Supp. at 657 n. 6; see Independent Order of Foresters, 919 F.Supp. at 153–54. Additionally, a plaintiff cannot convert a nonexistent Martin Act claim into another state law cause of action by artful pleading. See id.; Horn v. 440 East 57th Co., 151 A.D.2d 112, 119, 547 N.Y.S.2d 1, 5 (1st Dep't 1989).

■ The Martin Act prohibits various fraudulent and deceitful practices in the distribution, exchange, sale, and purchase of securities but does not require proof of intent to defraud or scienter. See CPC Int'l, 70 N.Y.2d at 276, 514 N.E.2d at 118, 519 N.Y.S.2d at 807. As a result, claims for breach of fiduciary 'uty and negligent and innocent misrepresentation, for example, which do not require a plaintiff to plead and prove intentional deceit, are covered by the Martin Act and cannot be asserted by private litigants.[8] See Independent Order of Forest-

---

7. The LAB's claims for negligent and innocent misrepresentation, discussed below, may also be dismissed for lack of adequately pleading justifiable reliance. See generally Kimmell v. Schaefer, 89 N.Y.2d 257, 263–64, 675 N.E.2d 450, 454, 652 N.Y.S.2d 715, 719 (1996) (discussing negligent misrepresentation); Heard v. New York, 82 N.Y.2d 66, 74–75, 623 N.E.2d 541, 545–46, 603

N.Y.S.2d 414, 418–19 (1993) (same); Dygert v. Leonard, 138 A.D.2d 793, 794, 525 N.Y.S.2d 436, 438 (3d Dep't 1988) (stating that if the "element of scienter is subtracted from a cause of action for fraud, the remainder constitutes innocent misrepresentation").

8. The Martin Act does not preclude private litigants from bringing common law fraud claims

*ers,* 919 F.Supp. at 153–54 (dismissing plaintiff's breach of fiduciary duty and negligent misrepresentation claims arising from defendant's alleged misdescription of CMOs in its sales brochures as an impermissible effort to bring a private action under the Martin Act); *Horn,* 151 A.D.2d at 119, 547 N.Y.S.2d at 5 (affirming the dismissal of plaintiffs' negligent misrepresentation and breach of fiduciary duty claims based on alleged oral misrepresentations in connection with the purchase of co-op shares); *Rego Park,* 191 A.D.2d at 622, 595 N.Y.S.2d at 492 (upholding the dismissal of a claim for negligent misrepresentation "because this cause of action sought, in essence, to pursue a private cause of action under the Martin Act"); *see also Vannest,* 960 F.Supp. at 657 n. 6 (noting that plaintiffs' breach of fiduciary duty and negligent misrepresentation claims, which were predicated on defendant's representations to plaintiffs before they purchased limited partnership interests, could be dismissed as violating the Martin Act).

▋ According to the LAB, however, the language and the legislative history of the Martin Act cannot be interpreted to preclude the assertion of the common law remedies. Yet this conclusion ignores the case law, cited above, to the contrary in which courts have held that the Martin Act precludes common law claims negligent misrepresentation and breach of fiduciary duty that are predicated on securities transactions.

The LAB also maintains that much of the cited precedents, particularly *Horn, Rego Park,* and *Whitehall,* are inapplicable because their effect is limited to claims relating to cooperatives and condominiums. The Martin Act, however, is not limited to cooperatives and condominiums, and these state cases did not limit their holdings to such circumstances. Moreover, the LAB's distinction ignores the decision in *Independent Order of Foresters,* which explicitly holds that the Martin Act precludes claims for misrepresentation and breach of fiduciary duty arising out of the sale of CMOs and limited

partnership interests. *See Independent Order of Foresters,* 919 F.Supp. at 153; *see also Vannest,* 960 F.Supp. at 657 n. 6.

In *Independent Order of Foresters,* the plaintiff had alleged a variety of claims in connection with its purchases of CMOs. As in the instant case, the plaintiff claimed that the defendants made false representations to the plaintiff regarding the securities. 919 F.Supp. at 151–52. On defendant's motion to dismiss, the court concluded as a matter of law that plaintiff's negligent misrepresentation claim could not be sustained. The court found that

> [a]ny claim that is covered by the Martin Act is therefore not actionable by a private party; otherwise, the party essentially would be permitted to bring a private action under the Martin Act. It is established that actions for negligent misrepresentation and breach of fiduciary duty, without intentional deceit, are covered by the Martin Act. . . . Plaintiff has brought both actions. Hence, these cause[s] of action are hereby dismissed.

*Id.* at 153–54 (citations and footnotes omitted). A similar result is mandated here.

In the instant case, Counts XIV and XV allege that the Brokers negligently and innocently misrepresented the bullish/bearish nature of certain CMOs. As asserted in the Complaint, the misrepresentations were made in connection with the purchase of CMOs by the Funds. Because the Martin Act precludes these causes of action, they are dismissed.

## IV. *The Brokers' Motion to Dismiss Counts II and XII Alleging Tortious Interference With Contracts Is Granted*

▋ To state a claim for tortious interference with contractual relations under New York law, a plaintiff must allege "(1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3)

---

because such claims require a plaintiff to prove intent or scienter. Therefore, courts allow these claims to proceed while simultaneously dismissing negligent misrepresentation and breach of fiduciary duty claims. *See e.g., Whitehall Ten-*

*ants Corp. v. Estate of Olnick,* 213 A.D.2d 200, 623 N.Y.S.2d 585 (1st Dep't), *appeal denied,* 86 N.Y.2d 704, 631 N.Y.S.2d 608, 655 N.E.2d 705 (1995).

defendant's intentional procuring of its breach; and (4) damages." *150 East 58th St. Partners, L.P. v. Wilkhahn Wilkening & Hahn GmbH & Co.*, No. 97 Civ. 4262, 1998 WL 65992, at *1 (S.D.N.Y. Feb.17, 1998) (*quoting Riddell Sports Inc. v. Brooks*, 872 F.Supp. 73, 77 (S.D.N.Y.1995)); *see Jews for Jesus, Inc. v. Jewish Community Relations Council of N.Y., Inc.*, 968 F.2d 286, 292 (2d Cir.1992); *Union Carbide Corp. v. Montell N.V.*, 944 F.Supp. 1119, 1136 (S.D.N.Y.1996); *Foster v. Churchill*, 87 N.Y.2d 744, 749–50, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996). Additionally, the plaintiff must assert that defendant's actions were the "but for" cause of the alleged breach of contract— that is, that there would not have been a breach but for the activities of the defendant. *See Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir.1990); *Michelle Pommier Models, Inc. v. Men Women N.Y. Model Management, Inc.*, No. 97 Civ. 6837, 1997 WL 724575, at *3 (S.D.N.Y. Nov.18, 1997); *Demalco Ltd. v. Feltner*, 588 F.Supp. 1277, 1280 (S.D.N.Y.1984); *Washington Ave. Assocs., Inc. v. Euclid Equip., Inc.*, 229 A.D.2d 486, 487, 645 N.Y.S.2d 511, 512 (2d Dep't 1996). The pleadings may not be conclusory; rather they must be supported by sufficient allegations of fact. *See 150 East 58th St.*, 1998 WL 65992, at *2; *S.A.E. Motor Parts Co., Inc. v. Tenenbaum*, 226 A.D.2d 518, 519, 640 N.Y.S.2d 615, 616 (2d Dept.1996).

Because the Complaint does not adequately plead "but for" causation, the tortious interference with contracts claims against the Brokers must be dismissed.

### A. Count II Alleging Tortious Interference With Contracts Between the Funds and ACM

■ LAB's Complaint alleges that, despite their knowledge that ACM's investment advisory agreements with the Funds obligated ACM to create and maintain market-neutral portfolios (or an appropriately directional portfolio for Quartz), and despite their knowledge of the Funds' decidedly bullish tilt, the Brokers induced ACM to breach its contracts by purchasing a great volume of toxic securities that were bullish or whose responses to interest rate changes were impossible to predict, and as a direct result of the interference by the Brokers with ACM's performance of its obligations to the Funds, the Funds have been damaged.

Despite the words "direct result" in the Complaint, the facts alleged negate the possibility that the Brokers' alleged actions were the "but for" cause for the alleged breaches of contract. After all, the LAB maintains that numerous dealers, including nonparties, were selling inappropriate securities to the Funds. (*See* Compl. ¶ 4 (acknowledging that the Brokers were "among" the principal sellers of CMOs to the Funds).) Thus, according to the Complaint, even if ACM had not purchased CMOs from each of the Brokers, it would have breached its contractual obligations to the Funds by making purchases from other broker-dealers.

The LAB contends that it is mere speculation that ACM would have breached its investment advisory agreements with the Funds absent the Brokers' involvement and proposes that the Brokers are injecting a trial issue into a motion to dismiss. However, the LAB must allege *facts* which, if proven, would show "that there would not have been a breach but for the activities of defendant." *Sharma*, 916 F.2d at 828; *see also In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 400–01 n. 3 (2d Cir.1994) (stating that "conclusory allegations of the legal status of the defendant's acts need not be accepted as true for the purposes of ruling on a motion to dismiss"). Here, the LAB has not alleged facts showing "but for" causation. Indeed, the LAB's own allegations are fatal to its tortious interference with contracts claim. The LAB alleges that in early 1994 one-half of the "volatile and esoteric" CMOs that the Funds owned were purchased from dealers other than Bear Stearns, DLJ, and Merrill Lynch. (*See* Compl. ¶ 40.) Thus if the Brokers had not sold the "volatile and esoteric" CMOs to the Funds, ACM would have—and did—purchase them from other brokers.

■ Once a plaintiff alleges facts, as does the LAB in the case at bar, establishing that the breaching party was predisposed toward breaching its agreement, the claim for tor-

tious interference must be dismissed for failure to plead "but for" causation. *See Special Event Entertainment v. Rockefeller Ctr., Inc.,* 458 F.Supp. 72, 78 (S.D.N.Y.1978); *see also Rapp Boxx, Inc. v. MTV, Inc.,* 226 A.D.2d 324, 642 N.Y.S.2d 228 (1st Dep't 1996). In dismissing a claim for tortious interference with contract, the court in *Special Event Entertainment* took note of plaintiff's allegations that the breaching parties "were not disposed toward honoring their alleged commitment even before [they] entered the negotiations." *Special Event Entertainment,* 458 F.Supp. at 78.

In the instant case, it cannot be said that if a specific Broker had not acted as it allegedly did the Funds would have purchased only appropriate securities. Because the LAB's allegations indicate that ACM was predisposed toward breaching its agreements with the Funds and would have done so independently of each of the Broker's actions or participation, the LAB has failed to allege causation. Indeed, the Complaint goes beyond alleging predisposition since ACM, in fact, purchased the "volatile and esoteric" CMOs from other broker-dealers. Thus Count II is hereby dismissed.

**B. *Count XII Alleging Tortious Interference With Contracts Between the Funds and the Brokers***

■ As to Count XII, the Complaint alleges that despite the existence of the PSA Agreements and other contracts that required liquidation of the Funds' portfolios in a commercially reasonable manner and each Broker's knowledge of those contracts, each Broker intentionally interfered with the other Brokers' contracts through the provision of lowball accommodation bids, which caused commercially unreasonable liquidations in breach of the agreements.

According to the LAB, the causation requirement has been met because "but for" the Brokers' accommodation bids, the Brokers would not have breached their PSA and other agreements. Yet this conclusory allegation without any relevant supporting facts is insufficient to state a cause of action for tortious interference with contractual relations against the Brokers. *See Euclid*

*Equip., Inc.,* 229 A.D.2d at 487, 645 N.Y.S.2d at 512.

Additionally, the Complaint alleges that "[a]s an integral part of its plan to purchase for itself the Funds' securities at prices well below fair market value, Bear Stearns entered into an agreement with Kidder, DLJ, Merrill Lynch, and other broker-dealers" to submit lowball bids. (Compl. ¶ 130.) Furthermore, elsewhere in the Complaint, the Brokers are alleged to have engaged in "an unlawful combination and conspiracy in restraint of interstate trade and commerce" in connection with the very same activity. (*Id.* ¶ 210.)

However, the LAB must allege "but for" causation for each individual Broker and cannot satisfy that requirement merely by alleging that two or more Brokers acted in concert to cause the breach. *See Crossland Fed. Sav. Bank v. 62nd and First Assocs., L.P.,* No. 92 Civ. 4056, 1993 WL 410461, at *4 (S.D.N.Y. Oct.12, 1993); *Sharma v. Skaarup Ship Management Corp.,* 699 F.Supp. 440, 447 (S.D.N.Y.1988) [hereinafter *Sharma I* ], *aff'd,* 916 F.2d 820 (2d Cir.1990); *see also Mina Investment Holdings Ltd. v. Steven W. Lefkowitz,* 16 F.Supp.2d 355, 97 Civ. 1321, slip op. at 8–13, 1998 WL 477440 (S.D.N.Y. Aug. 6, 1998) (dismissing tortious interference with contract claim for failure to allege "but for" causation where plaintiffs alleged that defendant conspired or acted in concert with the breaching party, and the allegations demonstrated that the breaching party was not inclined to fulfill its contractual obligations). The reason for this rule is that collusion involving a party to the contract indicates as a matter of law that the party involved was predisposed to breach its contractual obligations; thus, the allegedly interfering party cannot be the "but for" cause of the breach. In fact, as previously stated, a plaintiff who asserts a claim for tortious interference with contract must allege affirmatively that there would not have been a breach but for the activities of the particular defendant. *See Sharma,* 916 F.2d at 828.

The *Crossland* court dismissed a defendant's counterclaim for tortious interference with contract because defendant's assertion that "plaintiff participated in efforts 'to con-

spire with Cineplex to breach or repudiate its Lease with [defendant]' " failed to establish "but for" causation. *Crossland,* 1993 WL 410461, at *4. The court reasoned that plaintiff's activities with the Cineplex "in no way forecloses other reasons" for Cineplex's decision to violate its contract with defendant. *Id.*

In *Sharma I,* the district court dismissed a claim for tortious interference with contractual relations where the complaint alleged that "the Skaarup defendants procured the breach 'by conspiring and acting with Chemical to make it impossible for plaintiffs to arrange the necessary financing, which Chemical was obligated to allow and encourage.'" *Sharma I,* 699 F.Supp. at 447. The court found that "[t]he allegation that the Skaarup defendants acted in concert with Chemical implies that Chemical would have breached its obligations even without the involvement of the Skaarup defendants." *Id.* "In no way do plaintiffs allege that Skaarup defendants were the motivating force behind Chemical's breach." *Id.*

In the instant case, the allegation that the Brokers engaged in collusive conduct consisting of the same activity that constituted the alleged breaches of contract precludes the LAB's claim for tortious interference. Each Broker could not have been the cause of another broker's breach because, according to the Complaint, the agreement or conspiracy to liquidate the portfolios through the use of accommodation bids was a result of, and therefore flowed directly from, each Broker's individual decision to breach its agreements. As in *Crossland* and *Sharma I,* allegations of conspiracy or collusive conduct do not foreclose the possibility that the broker-dealers would have violated their contracts with the Funds regardless of the participation by the Broker at issue.

Because the LAB cannot allege that each Broker's conduct was the causal force behind the purported breaches of contract by the other broker-dealers, it has not sufficiently alleged "but for" causation, and therefore the tortious interference with contracts claim in Count XII against the Brokers is dismissed.

## V. *The LAB Has Not Adequately Pleaded Violations of the Sherman and Donnelly Acts*

According to the LAB, instead of liquidating the Funds' securities in *bona fide* auctions, the Brokers agreed to exchange, and did exchange, lowball accommodation bids that allowed each of them, and other broker-dealers, to acquire the securities in their possession at artificially depressed prices. The LAB alleges that by agreeing to forestall a competitive auction the Brokers engaged in a conspiracy in violation of the Sherman Act, 15 U.S.C. § 1, and New York's Donnelly Act, N.Y.Gen.Bus.Law § 340.

Section 1 of the Sherman Act reads, in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony. . . .

15 U.S.C. § 1.

To withstand a motion to dismiss, the plaintiff in a Sherman Act conspiracy claim must allege a concerted action by two or more persons that unreasonably restrains interstate or foreign trade or commerce. *See In re Nasdaq Market–Makers Antitrust Litig.,* 894 F.Supp. 703, 710 (S.D.N.Y.1995); *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1047 (S.D.N.Y.1993); *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Servs.,* 746 F.Supp. 320, 325 (S.D.N.Y.1990); *accord International Distrib. Ctrs., Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 793 (2d Cir.1987). Additionally, the plaintiff "must do more than merely allege that a conspiracy exists, it must provide some factual basis for that allegation." *Fort Wayne Telsat v. Entertainment and Sports Programming Network,* 753 F.Supp. 109, 115 (S.D.N.Y.1990); *see Garshman v. Universal Resources Holding Inc.,* 824 F.2d 223, 230 (3d Cir.1987); *Heart Disease Research Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972). For example, the plaintiff must identify the relevant product

market, the co-conspirators, and describe the nature and effects of the alleged conspiracy. *See In re Nasdaq,* 894 F.Supp. at 710; *International Television Prods. Ltd. v. Twentieth Century–Fox Television Div. of Twentieth Century–Fox Film Corp.,* 622 F.Supp. 1532, 1537 (S.D.N.Y.1985).

■■■■ Except in narrow classes of *per se* violations, the plaintiff must show that the defendants acted to restrain competition. To allege unreasonable restraint of trade, something more than a private dispute must be alleged. The relevant product market must be identified, and the plaintiff must " 'allege how the net effect of the alleged violation is to restrain trade in the relevant market, and that no reasonable alternative source is available' to consumers in that market." *International Television Prods.,* 622 F.Supp. at 1534 (*quoting Gianna Enters. v. Miss World Ltd.,* 551 F.Supp. 1348, 1355 (S.D.N.Y.1982)); *see North Jersey Secretarial School, Inc. v. McKiernan,* 713 F.Supp. 577, 583 (S.D.N.Y. 1989). The economic impact in the relevant market must be specified, and the plaintiff must show that "the alleged restraint of trade tends or is reasonably calculated to prejudice the public interest." *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 273 (5th Cir.1979).

■■■ In the instant case, the Brokers maintain that the LAB has not alleged any economic impact on the CMO market but only injury to the Funds and that this failure to plead restraint of trade mandates dismissal of the Sherman Act claim. By contrast, the LAB seeks to neutralize any such inadequacy of its pleadings by urging that the alleged bid-rigging conspiracy is a *per se* violation and therefore—unlike the "rule of reason" standard utilized in analyzing the sufficiency of an antitrust claim—it is not required to show deleterious impact on competition. The LAB suggests that because a horizontal bid-rigging scheme has been alleged, it is entitled to *per se* treatment. In support for its proposition, the LAB cites, *inter alia, United States v. Koppers Co.,* 652 F.2d 290, 291, 294 (2d Cir.1981), where a bid-rigging conviction was upheld without proof of unreasonable restraint of trade because the bid-rigging was found to be illegal *per se.*

However, merely labeling its claim as "bid-rigging" does not entitle the LAB to *per se* status and the less stringent pleading standards that such status would afford it. Affixing certain labels to alleged conduct is insufficient to invoke *per se* treatment.

"The Supreme Court has characterized as *per se* violations of the Sherman Act certain types of conduct so destructive of competition that they almost always result in unreasonable restraints of trade. Such characterization, however, is reserved for 'manifestly anticompetitive' practices." *Apex Oil Co. v. DiMauro,* 713 F.Supp. 587, 595 (S.D.N.Y. 1989) (*citing Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). Only a narrow class of practices warrant classification as *per se* violations. *See Gianna Enters.,* 551 F.Supp. at 1354; *see also Continental T.V.,* 433 U.S. at 49–50, 97 S.Ct. 2549; *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

In its reluctance to create new categories of *per se* violations, the Supreme Court has held that "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations." *United States v. Topco Assocs.,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *see Apex Oil Co.,* 713 F.Supp. at 596. Indeed, the Supreme Court has cautioned against an "unthinking application" of the *per se* categories:

> [E]asy labels do not always supply ready answers.... Literalness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally "price fixing," but they are not *per se* in violation of the Sherman Act. Thus, it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label "*per se* price fixing." That will often, but not always, be a simple matter.

*Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 8–9, 13 n. 24, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (citations omitted). It is typically, therefore, necessary to scrutinize a challenged practice and the industry affected before deciding whether

the practice is a *per se* violation. *See Apex Oil Co.*, 713 F.Supp. at 596.

■■■ Courts have recognized that a rigid *per se* classification is especially inappropriate where the complained-of practice is novel or unique. *See Broadcast Music,* 441 U.S. at 9, 99 S.Ct. 1551; *see Hertz Corp. v. City of New York,* 1 F.3d 121, 129 (2d Cir.1993) (stating that a *"per se* rule is used in the relatively narrow circumstance where courts have sufficient experience with the activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue"). Because the LAB's allegations in the instant case involve novel business practices and relationships that have not been addressed by the courts in an antitrust context, they preclude the application of *per se* analysis.

The LAB alleges that the mechanism used by the Brokers for the "purchase, sale, liquidation, and transfer of the securities in the Funds' portfolios" constituted an "unlawful combination and conspiracy in restraint of trade." (Compl. ¶ 210.) The alleged conspiracy involved agreements among the Brokers to supply "collusive, rigged, and lowball accommodation bids that were designed … to create the false appearance of competitive bidding for the Funds' securities in the liquidation auctions … and to provide a false pricing background for deemed sales…." (*Id.* ¶ 212.) However, the traditional "horizontal price-fixing" paradigm does not contemplate a business practice and circumstance, such as the one alleged here, in which an unprecedented multibillion dollar liquidation took place in a falling market, where the liquidation was governed by contract under which deemed sales were expressly permitted, where all parties understood that the contract permitted some form of concerted action as a mechanism by which to gauge prices, where there was no "widely distributed or readily available" price quotations for CMOs by which to set a standard price (*id.* ¶ 33), and where all of the Brokers alleged to have created the market were on the "sell" side.

In contrast, the authority on which the LAB relies present classic textbook examples of price fixing. Because of the unique nature of the circumstances surrounding the liqui-

dations involved at bar, a rigid *per se* analysis is inappropriate. *See Cha–Car, Inc. v. Calder Race Course, Inc.,* 752 F.2d 609, 613 (11th Cir.1985) ("The *per se* standard should not be extended to alleged restraints of ambiguous effect; any departure from the rule of reason standard must be based upon demonstrable economic effect, rather than from formalistic line drawing."); *cf. Apex Oil Co.,* 713 F.Supp. at 598 (observing that "what behavior constitutes a horizontal group boycott deserving of *per se* condemnation under the Sherman Act has been the source of considerable confusion in recent years" (citations omitted)).

Due to the novel and complex nature of the circumstances and market at issue, and the lack of clear precedent or prior consideration of this industry's customs or dynamics, the "rule of reason," requiring the demonstration of restraint of trade and economic impact in the relevant market, is the appropriate standard under which the LAB's antitrust claims will be treated. Under this standard, the Complaint fails to state a cause of action.

The LAB does not allege that the conduct of the Brokers had any economic impact on the CMO market at large or any prejudice to the public interest. Nor does it articulate how the alleged conspiracy during the last week of March 1994 had the effect of substantially lessening the competition in the relevant market. Moreover, the Complaint does not state that the Brokers' actions resulted in a lack of reasonable alternative sources for buyers and sellers of CMOs. In short, the LAB fails to adequately allege that anyone other than the Funds themselves was injured or prejudiced by the actions of the Brokers. This pleading failure is fatal to the LAB's Sherman Act cause of action. As the court stated in *Jarmatt Truck Leasing Corp. v. Brooklyn Pie Co., Inc.,* 525 F.Supp. 749 (E.D.N.Y.1981), when it dismissed a Sherman Act § 1 claim,

> [b]eyond its bald conclusions as to restraint of trade, the complaint fails to allege facts which show injury to competition, as distinct from injury to a competitor. No violation of Section 1 of the Sherman Act is possible absent proof of anti-competitive effect beyond the injury

to plaintiffs, and facts must be pleaded from which such effect can be inferred. *Id.* at 750 (citations omitted).

Instead of articulating a specified economic impact in a relevant market with defined boundaries, the LAB alleges only that "nationwide competition and trade were injured, unreasonably restrained and eliminated in relevant markets under the Sherman Act," (Compl. ¶ 214), and that the Brokers' acts "restrained competition within the State of New York." (*Id.* ¶ 221.) After sifting through the conclusory allegations, the Complaint simply alleges that the Funds were injured as a result of an alleged conspiracy during a two-day liquidation of the Funds' portfolios. That injury can be redressed in the context of the LAB's breach of contracts claims, not through the antitrust laws. Accordingly, Count VII of the Complaint is dismissed.

█ New York's antitrust law, the Donnelly Act, is "modeled on the Sherman Act and should be construed in light of federal precedent." *Kramer v. Pollock–Krasner Foundation*, 890 F.Supp. 250, 254 (S.D.N.Y. 1995); *see X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518, 634 N.E.2d 158, 161, 611 N.Y.S.2d 786, 789 (1994). Thus, since the LAB has failed to allege a federal antitrust claim against the Brokers, its Donnelly Act claim in Count VIII is also dismissed.

## VI. *Count XI Alleging Breach of Duty to Liquidate in a Commercially Reasonable Manner Is Dismissed Only as to Bear Stearns and DLJ*

█ The Brokers held most of the securities they liquidated pursuant to repos. The LAB represents that these repos were the functional equivalent of secured loans and that the Brokers, as secured parties, were obligated by Article 9 of the Uniform Commercial Code ("UCC") to exercise their right to liquidate in good faith and a commercially reasonable manner. *See* N.Y.U.C.C. § 1–203 (McKinney 1993); *id.* § 9–594 (McKinney 1990). The Complaint also alleges that the common law applicable to pledgees imposes a duty of commercial reasonableness in liquidation. In Count XI, the LAB alleges that the Brokers violated these statutory and common law duties.

Because Article 9 is only applicable to secured transactions, the maintenance of the instant claim depends upon the characterization of the repos. If they are purchase and sales agreements, the UCC is inapplicable and Count XI must be dismissed. If they are secured loans, the claim stands.

### A. *Repurchase Agreements Defined* [9]

A repurchase agreement, by its terms, involves two separate but related transactions: (1) a sale by a party (the "repo seller") of securities in exchange for cash and (2) an agreement by the repo seller to repurchase the same or equivalent securities for a specified price at a future date. In a reverse repurchase agreement, the party initially buys the securities in exchange for cash, and incurs a forward obligation to resell them. Every repo is also a reverse repo; that is, a reverse repurchase agreement is simply a repurchase agreement viewed from the perspective of the repo buyer. *See In re Bevill, Bresler & Schulman Asset Management Corp.*, 67 B.R. 557, 566–67 (D.N.J.1986).

Repos are creatures of the capital markets. Their purchase-and-sale form reflects a value-for-value exchange designed as such for use explicitly in those markets. The legal status of repo agreements is not easily subject to characterization—the purchase-and-sale framework incorporates characteristics of other transactional forms, including financings. For example, as in a financing, the repurchase price for the securities reflects the time value of the cash obtained by the repo seller in the initial sale. However, the repo structure is distinct from that of a loan in other respects. Unlike a lender taking collateral for a secured loan, a repo buyer "take[s] title to the securities received and can trade, sell or pledge them." *SEC v. Drysdale Sec. Corp.*, 785 F.2d 38, 41 (2d Cir.1986). Such free transferability of repo

---

9. The BMA, as *amicus curiae,* has submitted a memorandum to enlighten the Court about repos in general and their importance to the debt capital markets. The discussion in this subsection is based primarily on the BMA's *amicus curiae* brief.

securities renders repos attractive to securities dealers whose inventories of securities turn over rapidly and who may require securities to be available for a variety of settlement obligations. At the same time, the adjustability of the term of repo agreements makes them an ideal financial management tool for institutional investors investing cash balances. Thus, for "such entities as state and local governments, public and private pension funds, money market and other mutual funds, banks, thrift institutions, and large corporations, repos have become a vital tool of cash management." S.Rep. No. 98–65, at 45 (1983) [hereinafter *1983 Senate Repo Amendments Report*].

Repos are the principal method used by securities dealers to fund their acquisition of U.S. Treasury securities. *See* Department of the Treasury, Sec. and Exch. Comm'n, and Bd. of Governors of the Fed. Reserve Sys., *Joint Report on the Government Securities Market* at A–11 (Jan.1992) [hereinafter *1992 Joint Report*]. The Treasury relies heavily on primary dealers to absorb new government debt issues, and repos are extensively used by dealers to obtain the cash necessary to permit their underwriting of such issues. *See, e.g., Government Securities Act Amendments of 1993*, H.R.Rep. No. 255, at 10–11 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2996, 2997. By maximizing the ease and flexibility with which dealers can acquire and hold inventories of Treasury securities, repo transactions contribute significantly to the depth and liquidity of the secondary market for Treasury securities. *See, e.g., 1983 Senate Repo Amendments Report* at 45–46. Together with other trading techniques and transactions, repos and reverse repos "have benefitted the market and the taxpayer by increasing liquidity, thereby lowering the government's financing costs." *1992 Joint Report* at 1.[10]

Repo transactions perform a similar function with respect to other fixed-income securities, including federal agency securities such as those issued or guaranteed by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").[11] They are a vital and cost-efficient mechanism for broker-dealers to fund their inventory and dealing activities in these securities. The existence of a repo market in a particular type of securities also adds to the liquidity of the underlying cash market for the securities. CMOs, like those involved in the instant case, are securities where cash flows from a securitized mortgage pool are repackaged into classes of interests with different projected maturities and principal repayment schedules which appeal to a broad range of investors with specific investment needs and objectives. CMOs allow their investors to retain the yield and credit quality advantages of mortgage-backed securities while reducing many of their perceived burdens, particularly those relating to prepayment uncertainty. The ultimate beneficiaries of CMOs and other mortgage-backed securities are residential home buyers who are able to obtain lower-cost mortgages as a result of the cheaper cost of funds to originators. As Congress has recognized, the CMO market, and the repo market for CMOs which enable dealers in these securities, is, like the repo market in U.S. Treasury securities, important to the national economy. *See generally* S.Rep. No. 98–293 (1984) (noting that the Secondary Mortgage Market Enhancement Act in 1984 was enacted for the purpose of "encourag[ing] the 'broadening of the market for mortgage-backed securities by encouraging

---

**10.** Repos involving U.S. Treasury securities are also used by the Federal Reserve System as its primary tool for implementation of monetary policy. *See In re Bevill, Bresler & Schulman Asset Management Corp.*, 878 F.2d 742, 745 (3d Cir.1989).

**11.** As stated by the BMA, the repo market fosters important interrelationships among the different types of fixed-income securities. The market for federal agency securities, and the fixed-income markets generally, are closely linked to the market for Treasury securities: the price of an agency security is generally expressed in terms of its "spread" over Treasury securities of comparable maturity, and dealers quickly act on arbitrages between Treasury and agency security markets. *See 1992 Joint Report* at D–4 to D–5. Rapid movements of securities through repos and reverse repos facilitate this process and are thus among a number of financial mechanisms that contribute to the smooth functioning of the nation's fixed-income markets.

more extensive involvement of the private sector' ").

## B. *Characterization of the Repos*

■ The key to the inquiry as to whether the repos in this case should be characterized as purchase and sale agreements or secured loans lies in the intention of the parties. Article 9 only applies to transactions in which the parties' intent is to create a security interest. *See* N.Y.U.C.C. § 9–102 (McKinney 1990); *see also In re O.P.M. Leasing Servs., Inc.*, 23 B.R. 104, 115 (Bankr.S.D.N.Y. 1982) (stating that "Article 9 applies only to a transaction which is intended to create a security interest in personal property"). To determine whether the parties to a transaction intended to create a security interest, courts look to the agreement governing the transaction. Where the parties' intention is clearly and unambiguously set forth in the agreement, effect must be given to the expressed intent. *See John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 461 (2d Cir.1994) (stating that where the agreement is clear, courts should look to the "terms expressed in the contract itself, rather than to 'extrinsic evidence of terms that were not expressed or judicial views on what terms might be preferable'"); *In re O.P.M.*, 23 B.R. at 116 & n. 8 (observing that "[i]t would have been a simple matter for the parties expressly to provide ... for the grant of a security interest," but because they did not "it is evident that no security interest was ever intended"). The objective intent of the parties "expressed or apparent in the writing controls" the agreement's interpretation, while the "undisclosed, subjective intent of the parties has no bearing" on the construction of the contract. *In re Bevill*, 67 B.R. at 586.

In the case at bar, the governing contracts include the PSA Agreements into which Bear Stearns and DLJ entered with each of the

Funds, the PSA Agreement into which Merrill Lynch entered with Quartz, and the trade confirmations relied on by Merrill Lynch as to Granite Partners and Granite Corp.[12]

### 1. *The PSA Agreements*

According to the Brokers, the plain language of the PSA Agreement demonstrates that each of the Brokers was an outright purchaser of bonds from the Funds and not merely a "secured party." The Brokers assert that the intention of the Brokers and the Funds not to engage in secured transactions is made clear by paragraph 6 of the PSA Agreement, which reads, in pertinent part: "the parties intend that all Transactions hereunder be sales and purchases and not loans." Thus, under the PSA Agreement, the securities acquired by the Brokers in reverse repos were sold to the Brokers and were not collateral pledged to secure a loan. Consistent with the parties' intent to effect a transfer of ownership, paragraph 8 of the PSA Agreement states, in relevant part:

> Title to all Purchased Securities shall pass to Buyer and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise pledging or hypothecating the Purchased Securities.

Thus, claim the Brokers, this Court need not look beyond the four corners of the PSA Agreement to determine that the repurchase transactions at issue are purchases and sales and not secured loans.

The LAB counters that the contracts reflect the parties understanding that the Funds' repos were the functional equivalent of secured loans, extrinsic evidence will indicate that the Brokers viewed their repos as collateralized loans, and a finding that repurchase agreements are purchases and sales can only be accomplished after a careful con-

---

12. Consideration of the agreements themselves is appropriate on the motion to dismiss because the LAB must rely on the agreements to prove contractual relations with the Brokers, the LAB had notice of them when the action was filed, and the LAB itself utilizes them in its opposition papers. *See Belin*, 1998 WL 391114, at *3–*4; *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808–

09 (2d Cir.1996) (permitting consideration of the full text of documents "integral" to plaintiff's claim on motion to dismiss); *Barnum v. Millbrook Care Ltd. Partnership*, 850 F.Supp. 1227, 1230 (S.D.N.Y.) (finding reference to the full text of a contract on a motion to dismiss appropriate even though the plaintiff had not formally incorporated it by reference), *aff'd*, 43 F.3d 1458 (2d Cir.1994).

sideration of all of the evidence on a more fully-developed record.

In *In re Bevill,* a bankruptcy court was required to determine whether the securities underlying repo transactions were property of the debtor estates or belonged instead to repo and reverse repo participants. That issue turned on whether the repos constituted purchases and sales or collateralized loans. In determining the parties' intent, the court noted that the trade tickets of each executed repo reported them as purchases and sales, that the standard Repurchase Agreements used the language of "buyer" and "seller"—not lender and borrower—and that under these agreements the buyer could freely rehypothecate the purchased securities. · The court concluded that "[t]he unequivocal language of purchase and sale in the repo and reverse repo agreements at issue ... is strong *prima facie* evidence that the parties intended the transactions to be treated accordingly." *In re Bevill,* 67 B.R. at 597. However, despite noting that the repo agreement at issue made no reference to secured loans or to any intention to grant a security interest to the lender, because the agreements contained "terms customarily found in secured loan transactions," the court held that it had to consider extrinsic evidence of the parties' intentions before it could characterize the repos in that case as sales or loans. *See id.* at 590.

In its final analysis, the court in *In re Bevill* concluded that

repos and reverse repos are hybrid transactions which do not fit neatly into either a secured loan or purchase and sale classification. There is no question that repo and reverse repo transactions have functional attributes which resemble collateralized loans. The initial taking of margin (the "haircut"), the right of substitution, and the "mark-to-market" provisions are undeniably secured loan characteristics not commonly found in purchase and sale transactions. In addition, principal and/or interest paid on the underlying securities remains the property of the seller. On the other hand, the repo buyer's unrestricted right to trade the securities during the term of the agreement represents an incident of ownership which does not pass to a secured lender in a collateralized transaction.

*Id.* at 596–97.

Indeed, as the Second Circuit stated in *Drysdale,* the " '[defendant] ignores a most significant difference between repos and standard collateralized loans.... In the latter transaction the lender holds pledged collateral for security and may not sell it in the absence of a default. In contract, repo "lenders" take title to the securities received and can trade, sell or pledge them.' " *Drysdale,* 785 F.2d at 41, quoted in *In re Bevill,* 67 B.R. at 593–94.

Furthermore, stated the court in *In re Bevill,*

while the risk of market fluctuations in the value of the underlying securities rests with the original seller, this truism is of no legal consequence. The seller's interest in the market value of the securities is no greater in a secured loan transaction where he retains beneficial ownership of the securities than in a purchase and sale transaction where he is contractually bound to reacquire ownership of them. Clearly, any attempt to determine whether a repo or reverse repo transaction is more like a secured loan than a purchase and sale by weighing economic factors on a finely tuned balance scale would be an essentially formalistic and ultimately unproductive exercise.

In any event, the proper characterization of repo and reverse repo agreements does not rest solely on an evaluation of the economic substance of the individual transactions. Rather, the intent of the parties viewed in the context of the entire market in which these transactions take place is the controlling consideration under ... New York ... law. This intent must be gleaned from the express terms employed in the transaction documents as well as relevant extrinsic evidence of intent, including trade custom and usage, market realities and the parties' course of conduct and performance.

*In re Bevill,* 67 B.R. at 597.

The agreements in *In re Bevill* differ from the instant PSA Agreements in an im-

portant respect such that extrinsic evidence need not be considered: while the agreements in that case used isolated terms of purchase and sale, the PSA Agreements at issue affirmatively state the parties' intent to treat the transaction as such. Thus, claim the Brokers, the LAB cannot point to any place in the PSA Agreements that make their terms ambiguous. Moreover, they continue, the PSA contracts were created after the decision in *In re Bevill* and after Congress amended the Bankruptcy Code in 1984 to make clear that repos should not be considered secured transactions for bankruptcy purposes. In addition, the court in *In re Bevill* soundly rejected the contention that the similarities between repos and loans were a basis for construing repo transactions as secured loans. "The mere presence of secured loan characteristics in repo and reverse repo agreements is not enough to negate the parties' voluntary decision to structure the transactions as purchases and sales." *Id.* at 598.

Because the standard industry documentation for repo transactions prepared by the BMA and used by the Brokers in this case explicitly states that the parties "intend that all Transactions hereunder be sales and purchases and not loans," PSA Agreement ¶ 6, that intention must be honored.[13] Therefore, the repos entered into by Bears Stearns and DLJ with each of the Funds, as well as the PSA agreement entered into by Merrill Lynch with Quartz, are to be treated as a matter of law as purchase and sale agreements and not secured loans subject to Article 9 of the UCC.

Policy considerations and trade custom and usage support such a finding. Moreover, ignoring the affirmative intent of the parties would inject unpredictability and insecurity in the manner by which major financial institutions obtain credit. The decision by market participants to enter into a repo transaction documented using the PSA Agreement, structured as a purchase and sale, thus carries with it a wide variety of legal and regulatory consequences. Market participants who prefer to enter into secured lending transactions rather than repos may do so (with the attendant legal result that their transaction will be treated as a loan); participants who prefer to enter into a sale and wholly distinct forward purchase (with attendant legal consequences) may also do so. The determination of market participants that elect to enter into a repo transaction has been and should be respected and their settled expectations will not be overturned.

According to the BMA, repos have evolved to fulfill certain market needs and objectives that cannot be served by secured loans. Critical to the usefulness, flexibility, and liquidity of the repo market is the transfer of ownership of the repo securities to the repo buyer and the repo buyer's ability to sell, transfer, or pledge the securities purchased in a repo transaction during its term. The mobility of repo securities is what makes them a key tool of the funding markets, enabling dealers to continuously convert their securities inventory to cash to use to finance the purchase of yet additional securities and thereby make markets. Reverse repos are often used by dealers to obtain securities needed for deliveries when they are "short," thereby avoiding "fails" in the market and facilitating settlements and the smooth functioning of the market. The flexibility of repo buyers with respect to the repo securities also contributes to the popularity of repos s flexible cash management vehicles, thereby bringing a large supply of diverse cash investors to the repo markets.

---

**13.** The operative provisions of the PSA Agreement conform to this stated intention. The parties are denominated "Buyer" and "Seller," they agree that on the "Purchase Date" for a transaction the "Purchased Securities" will be transferred to the "Buyer" or its agent against payment of the "Purchase Price." On the "Repurchase Date," this process occurs in reverse. The parties further acknowledge the difference between their repo transactions and conventional secured indebtedness by agreeing that each "Transaction" is a "repurchase agreement" and a "securities contract" entitled to the benefits of special protective provisions under the Bankruptcy Code. Perhaps most telling, the parties agree that the title to the Purchased Securities passes to the Buyer, who is explicitly permitted to engage in repos with the Purchased Securities or otherwise transfer or hypothecate them. *See Drysdale*, 785 F.2d at 41. Under prevailing market practice, the Buyer, as owner, may sell the Purchased Securities.

Applying to repurchase transactions the provisions of Part 5 of UCC Article 9, asserts the BMA, which governs the disposition of collateral after default, for example, would undermine the requisite flexibility of the repo market. As many of the provisions in Part 5 are not subject to consensual predefault waiver by the parties, see U.C.C. § 9–501(3), repo counterparties would be unable to establish by contract their rights and remedies in a default situation, thereby introducing uncertainties in the repo marketplace. The health and efficiency of the repo market depends on market participants' ability to transact on well-settled understandings and certainty as to the consequences of their transactions and/or failure to perform their transactions. It was this need for certainty in expectations, according to the BMA, that led the repo market participants, through the BMA, to publish the PSA Agreement as industry standard contractual documentation and provide a legal framework establishing the rights and obligations of the parties in repo transactions based on market practices.[14]

Application of Article 9 would additionally cast doubt on this efficacy of certain remedy provisions of the widely used PSA Agreement in cases of default. For example the Agreement provides that upon default of the repo seller, a repo buyer may elect, in lieu of selling the purchased securities, to engage in a "deemed sale" of the purchased securities and give the defaulting repo seller credit in an amount equal to the price obtained from a generally recognized source. See PSA Agreement ¶ 11. The repo buyer retains its ability to seek payment from the repo seller for any remaining deficiency between the credited "deemed sale" price and the contractually agreed repurchase price (plus any other amounts owing by the defaulting party). Id. In contrast, Article 9 requires a secured party, who under certain circum-

stances takes in a defaulting debtor's collateral, to receive the debtor's consent and waive its deficiency claim. See U.C.C. § 9–505. The BMA proposes that the application of this provision, with its 21–day notice requirement, would nullify the "real world" swift liquidation mechanism that the repo market and its participants require. This sort of uncertainty could have adverse consequences on the repo market.

The LAB concedes that repos play a vital role in providing liquidity, thereby reducing risk and interest rates, but it attempts to distinguish the repos at issue here—which were primarily in securities issued by the government-sponsored agencies Fannie Mae and Freddie Mac by claiming that they do not play anything like the role of Treasury bills in the nation's financial infrastructure. The LAB thus urges formulation of different rules based on the type of securities involved. Yet the LAB ignores the fact that the PSA Agreement is an industry standard master repo agreement that applies generally to all repo transactions and does not distinguish between Treasuries and other types of securities. Therefore the AB requests a ruling that the same words in the very same contract should be interpreted differently depending upon the type of security at issue. Identical contracts would sometimes be subject to Article 9 and sometimes not. Such a result fosters unwarranted uncertainty.

Moreover, the market for Fannie Mae and Freddie Mac securities is vitally important not only to the nation's financial markets but also to the nation's housing markets. Congress's goal in creating CMO-issuing National Mortgage Associations like Fannie Mae and Freddie Mac was to

> provide ongoing assistance to the secondary market for residential mortgages ... by increasing the liquidity of mortgage investments and improving the distribution

---

**14.** The BMA also maintains that Article 9 would impinge upon repo participants' rights with respect to repo securities in the nondefault context. The BMA uses, as an example, section 9–207, which prescribes the rights and duties of a secured party holding collateral in its possession. While section 9–207(2)(e) provides that "the secured party may repledge the collateral upon terms which do not impair the debtor's right to redeem it," it does not permit a secured party to sell or dispose of the collateral in its possession. The application of Article 9 would negate a repo buyer's contractual right to freely sell the repo securities and may hamper the repo buyer's right to rehypothecate the repo securities. These rights of the repo buyer are inherent features of repo transactions, key to their value to the capital markets.

of investment capital available for residential mortgage financing; and ... promote access to mortgage credit throughout the Nation ... by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing....

12 U.S.C. § 1716. Indeed, the success of Fannie Mae and Freddie Mac and the securities they issue has helped to significantly lower the mortgage rates paid by homeowners in this country. *See* S.Rep. No. 102–282, at 30–31 (1992) (stating that "[m]ost mortgage interest rates are generally thought to be ¼ to ½ of the percentage point lower ... than they would otherwise be"). "Together, [Fannie Mae and Freddie Mac] now provide financing for more than a third of all home loans outstanding...." *Id.*

Furthermore, the instant ruling is consistent with case law. In contexts such as commercial law and the antifraud provisions of the federal securities law, repos generally are viewed as purchases and sales. *See In re Bevill*, 67 B.R. 557, and *Drysdale*, 785 F.2d 38. For other purposes, such as taxes, they are typically viewed as financings. *See Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123, 115 S.Ct. 557, 130 L.Ed.2d 470 (1994). For accounting purposes, they are viewed either way, depending upon particular factors. In yet other circumstances, such as under Section 559 of the Bankruptcy Code, repo transactions have been assigned a distinct legal status which acknowledges their unique attributes.

Because the PSA Agreement is not ambiguous, because it clearly provides that the parties intended the transaction to be treated as a purchase and sale, and because such a finding is consistent with the practices and expectations of the securities industry, *see In re Bevill*, 67 B.R. at 598, Count XI of the Complaint is dismissed as to Bear Stearns and DLJ, and as to Merrill Lynch it is dismissed only with respect to the PSA Agreement into which it entered with Quartz.[15]

**2. *Trade Confirmations Upon Which Merrill Lynch Relied***

Merrill Lynch did not execute PSA Agreements with Granite Partners and Granite Corp. Instead, it relied on trade confirmations for the contract terms applicable to the repo transactions. Those confirmations state:

THE TRANSFEROR/SELLER SHALL BE DEEMED TO HAVE GRANTED THE TRANSFEREE/PURCHASER, AS OF THE PURCHASE DATE, A SECURITY INTEREST IN THE SECURITIES ("SECURITIES" PLEDGED/SOLD PURSUANT TO A TRANSACTION HEREUNDER) FOR SUCH TRANSACTION (AND IN ALL INCOME AND DISTRIBUTIONS THEREON AND PROCEEDS THEREOF) TO SECURE ITS OBLIGATION TO REPURCHASE SUCH SECURITIES, UNLESS THE SELLER IS IN DEFAULT, THE SELLER SHALL BE ENTITLED TO ALL PAYMENTS OF PRINCIPLE [sic] AND INTEREST ON THE SECURITIES, AND THE PURCHASER SHALL, UPON RECEIPT, REMIT TO THE SELLER ANY SUCH PAYMENTS RECEIVED BY IT, SUBJECT TO ITS OBLIGATION TO RESELL THE SECURITIES (OR EQUIVALENT SECURITIES) TO THE SELLER, THE PURCHASER MAY SELL, PLEDGE OR OTHERWISE TRANSFER THE SECURITIES.

 Here, the language is far more ambiguous. Unlike the PSA Agreement, it does not contain an unequivocal expression of intent. In cases where the express terms of a contract or agreement are ambiguous, unclear, or conflicting, and the intended meaning and operation of the contract cannot reasonably be derived from the "four corners of the writing," courts allow the "introduction and examination of extrinsic evidence of intent as an aid in interpretation." *In re Bevill*, 67 B.R. at 587. Consideration of extrinsic evidence of the parties' intent is properly left to a later time, with the benefit of a fully-developed factual record. Therefore, the

---

**15.** Additionally, the LAB's allegation that the forward contracts between the Funds and Bear

Stearns resulted in secured loans is unsupported and therefore dismissed.

motion to dismiss Count XI against Merrill Lynch regarding the transactions evidenced by trade confirmations is denied.

## VII. Although the Motion to Dismiss Count X Alleging Breach of Contract Due to Commercially Unreasonable Liquidations Is Denied, the Claim Is Hereby Modified

In Count X, the LAB alleges that the Brokers violated the PSA and other agreements by liquidating the Funds' securities at below-market prices. By exchanging lowball accommodation bids and conducting sham auctions that led to the sale of the Funds' portfolios at prices substantially below fair market value, the Brokers breached their obligation to liquidate at a price "obtained from a generally recognized source or the most recent closing bid quotation from such a source." (Compl. ¶ 233.) Additionally, the LAB contends, by deliberately depressing the prices at which the Funds' CMOs were sold the Brokers breached their contractual duty to liquidate in good faith and in a commercially reasonable manner.

While DLJ does not move against this cause of action, Merrill Lynch proposes that it should be dismissed under Rule 9(b), and Bear Stearns challenges it insofar as it alleges a breach of the implied duty of "commercial reasonableness."

### A. Rule 9(b) Does Not Apply to the Contract Claim

On its face, Rule 9(b) does not apply to contract claims, but only to "averments of fraud and mistake." Merrill Lynch's contention that Count X fails to meet the requirement of Rule 9(b) does not command solicitude because the authority it cites is inapposite to the instant case.

For example, Merrill Lynch invokes Frota v. Prudential–Bache Securities, Inc., 639 F.Supp. 1186, 1193 (S.D.N.Y.1986), in which the court applied Rule 9(b) to a claim that "merely incorporates the allegations of the securities fraud and RICO counts." By contrast, the LAB's contract claim does not "merely incorporate" the fraud allegation, nor does it depend in any way on a showing of fraud. It is based on the allegation that

the Brokers' below-market liquidation of the Funds' portfolios breached specified contract provisions, as well as the Brokers' obligation to liquidate in good faith. Rule 9(b) is inapplicable to such a claim.

### B. Implied Duties of Good Faith and Commercial Reasonableness

The Complaint alleges a breach of both the implied duties to liquidate the Funds' holdings in good faith and in a "commercially reasonable manner." (Compl. ¶ 232.) While Bear Stearns has no quarrel with the requirement of good faith, it takes issue with that of commercial reasonableness.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389, 663 N.E.2d 289, 292, 639 N.Y.S.2d 977, 979 (1995). The covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included," and it prohibits either party from acting in a manner "which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (citations and internal quotations omitted); *see Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir.1994) (stating that "the implied covenant of good faith and fair dealing inheres in every contract"). Breach of the covenant gives rise to a cognizable claim. *See Chase Manhattan Bank, N.A. v. Keystone Distribs., Inc.*, 873 F.Supp. 808, 815 (S.D.N.Y.1994) (finding that "[a] party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations").

Indeed, the broker's "power to liquidate must be exercised in good faith under the existing facts and circumstances." *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 992 (S.D.N.Y.1984); *see Modern Settings, Inc. v. Prudential–Bache Sec., Inc.*, 936 F.2d 640, 644 (2d Cir.1991) (stating that the "contractual power [to liquidate] must be exercised in good faith"); *see also Travellers Int'l*, 41 F.3d at 1575 ("Even when a contract confers

decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith.").

 While an implied covenant of good faith and fair dealing is recognized in most contracts under New York law, the duty cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract. *See Warner Theatre Assoc. Ltd. Partnership v. Metropolitan Life Ins. Co.,* No. 97 Civ. 4914, 1997 WL 685334, at *6 (S.D.N.Y. Nov. 4, 1997). Any purported duty of good faith "cannot add to, detract from, or alter the terms of the contract itself." *Id.; see CIBC Bank and Trust Co., Ltd. (Cayman) v. Banco Cent. Do Brasil,* 886 F.Supp. 1105, 1118 (S.D.N.Y.1995) ("[A]lthough the obligation of good faith is implied in the contract, it is the terms of the contract which govern the rights and obligations of the parties.").

 The phrase "commercially reasonable manner," however, has been given special meaning under Article 9 of the UCC, and the totality of those concepts will not be imported wholesale into the PSA Agreement to which, as discussed above, Article 9 does not apply. The contract claim is to be interpreted under ordinary contract jurisprudence. Therefore, to the extent the LAB seeks to impose an *implied* obligation by its use of the term "commercially reasonable,"

Count X is to be modified such that any reference invoking the duty to liquidate "in a commercially reasonable manner" shall be deleted. If the LAB wishes, it may replace the term with the covenant of "fair dealing."

## VIII. *The LAB May not Maintain Count I of the Complaint Alleging a Claim for Inducing and Participating in a Breach of Fiduciary Duty Against the Brokers*

 To state a claim for inducing or participating in a breach of fiduciary duty under New York law,[16] the plaintiff must allege that a fiduciary breached its obligations to another, that the defendant knowingly induced or participated in the breach, and that the plaintiff suffered damages as a result of the breach. *See S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 847–48 (2d Cir. 1987).

As stated in the Complaint, the objective of Granite Corp. and Granite Partners was to invest on a market-neutral basis. Askin and ACM were supposed to employ sophisticated computer models capable of analyzing the impact of interest rate changes on prepayments, cash flows, and yields in order to balance bullish and bearish CMOs. It was anticipated that the Funds would achieve a high rate of return through this process, without exposure to upward or downward movements in interest rates. The Complaint

---

16. As an initial matter, the LAB contends that their tort claim is to be governed by the laws of the Cayman Islands and Delaware because the Funds were organized under the laws of those jurisdictions. New York law, however, governs this cause of action. It was brought in a New York federal court by and against entities and individuals located in New York and based on facts alleged to have occurred in New York. Significantly, the disposition of the claim—that the Brokers induced and participated in a breach of fiduciary duty by a money manager of investment funds—is vitally important to the financial industry, which is centered in New York. For these reasons, New York substantive law applies to the claim and, therefore, to the applicability of the Brokers' *in pari delicto* defense discussed below. *See Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030 (2d Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997).

The LAB cites to this Court's decision in *ABF Capital Management v. Askin Capital Manage-*

*ment, L.P.,* 957 F.Supp. 1308, 1331 (S.D.N.Y. 1997), for the proposition that its claim for inducing and participating in breach of fiduciary duty will be governed by Cayman Islands and Delaware law. Yet, the LAB misreads the decision. In discussing whether investors in the Funds had standing to bring aiding and abetting claims against broker-dealers, this Court in *ABF* merely held that the investors' claims are derivative claims under Cayman Islands and Delaware law. *Id.* A choice of law analysis to determine which law should apply to the aiding and abetting breach of fiduciary duty claim was not performed at that time. As noted recently in *Solow v. Stone,* 994 F.Supp. 173 (S.D.N.Y.1998), under New York's choice of law rules, the law of the state of incorporation controls a breach of fiduciary duty claim while New York law controls the plaintiff's claim for aiding and abetting the breach of fiduciary duty because the acts giving rise to the claim took place, in significant part, in New York. *Id.* at 177.

alleges that Askin and ACM had a fiduciary duty to adhere to this investment strategy. They, however, breached that duty by failing to use adequate analytic models and by constructing portfolios that, far from being market-neutral, were dangerously bullish, containing, in particular, inordinate numbers of inappropriate, highly toxic, bullish inverse IOs.[17]

The Complaint further alleges that the Brokers knew of Askin and ACM's duty to follow the Funds' investment strategy; that they knew Askin and ACM lacked the ability to analyze the securities that the Brokers were creating and selling to the Funds; and that they knew of the Funds' drastic bullish tilt. Despite this knowledge, the Brokers induced and participated in Askin and ACM's breach of duty by urging them to buy ever greater quantities of toxic inverse IOs and other bullish or unpredictable securities, including inappropriate forward-settling CMOs that the Brokers knew Askin and ACM were unable to analyze.

The Brokers maintain that the claim for inducing and participating in Askin and ACM's breach of fiduciary duty fails because of the doctrine of *in pari delicto*. According to the Brokers, the LAB is collaterally estopped from bringing the instant claim because of the decision in *Granite Partners, L.P. v. Primavera Familienstiftung*, 194 B.R. 318 (Bankr.S.D.N.Y.1996) [hereinafter *Granite I*], and because the *in pari delicto* defense bars the claim as a matter of law. The LAB counters that *Granite I* does not preclude the claim because the allegations in the instant Complaint differ from that in *Granite I*, that the applicability of *in pari delicto* cannot be established on the pleadings because the relative degrees of culpability must be determined, and that the doctrine is inapplicable to a bankruptcy trustee and his successors.

## A. *Granite I and Collateral Estoppel*

In *Granite I*, The Honorable Stuart M. Bernstein ruled that the Funds, then represented by the Trustee, could not bring an aiding and abetting breach of fiduciary duty claim against several broker-dealers under the doctrine of *in pari delicto*. The Brokers submit that this holding collaterally estops the Funds from asserting Count I of the Complaint.

The doctrine of collateral estoppel "bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir.1992). For collateral estoppel to apply, two requirements must be satisfied: "[f]irst, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded ... must have had a full and fair opportunity to contest the prior determination." *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67, 492 N.Y.S.2d 584, 588 (1985); *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 371 (2d Cir.1997), *cert. denied*, ——— U.S. ———, 118 S.Ct. 1676, 140 L.Ed.2d 814 (1998).

In *Granite I*, the Trustee filed an adversary proceeding in the Bankruptcy Court on behalf of the Funds to enjoin certain equity holders and their representatives from violating the automatic stay by pursuing claims against Askin and ACM for breach of fiduciary duty and against several broker-dealers, including the Brokers here, for aiding and abetting that breach. The Trustee asserted that the claims for mismanagement, waste, and breach of fiduciary duty belonged to the debtor Funds, not the investors. Judge Bernstein found that once bankruptcy ensues, claims for breach of fiduciary duty could be asserted only by the Trustee on behalf of the debtor estates. *Granite I*, 194 B.R. at 328. However, Judge Bernstein also found that where the debtor's insiders acted in concert with third parties, the doctrine of *in pari delicto* may be invoked.

In *Granite I*, the investors had alleged that the defendant broker-dealers aided, abetted, and influenced Askin and ACM to breach their fiduciary duties to the Funds.

---

**17.** Quartz was intended to be market-directional. Despite concerns about rising interest rates, which dictated the purchase of bearish securities, Askin and ACM breached their duties by acquiring for Quartz the same bullish CMOs they were buying for Granite Corp. and Granite Partners.

*Id.* at 330. Judge Bernstein found that "the law imputes to the corporation the knowledge and conduct of the guilty insider; a corporation only acts through its agents, and the imputation of the agent's wrongful conduct lies at the heart of *in pari delicto.*" *Id.* Relying on the Second Circuit's decisions in *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085 (2d Cir.1995), and *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991), Judge Bernstein concluded that the doctrine of *in pari delicto* applied to the Funds and would preclude the Trustee from asserting claims against the broker-dealers for aiding and abetting a breach of fiduciary duty by Askin and ACM. The analysis in *Granite I* was confirmed by this Court. *See Primavera Familienstiftung v. Askin,* No. 95 Civ. 8905, 1996 WL 494904, at *12 (S.D.N.Y. Aug.30, 1996) ("Applying the doctrine, Judge Bernstein held that the *in pari delicto* doctrine deprived the Trustee of the ability to bring the claims—which would otherwise belong to the Funds' estate—for waste, mismanagement, and breach of fiduciary duty.").

The Brokers urge that because the Funds are the same parties that moved to enjoin the investor suits in *Granite I,* they had a full and fair opportunity to contest the prior determination. The LAB, however, responds that it is not collaterally estopped by the *Granite I* decision because, unlike Primavera Familienstiftung, the party which the Funds' Trustee sought to enjoin in *Granite I,* the LAB does not allege that Askin or ACM committed fraud against the Funds.

Because the allegations in the two cases differ somewhat, Count I will not be dismissed pursuant to a collateral estoppel approach. However, accepting the allegations of the LAB's Complaint as true, the doctrine of *in pari delicto* provides an independent basis for dismissal.

### B. *The Doctrine of In Pari Delicto May Be Applied to Bar Count I of the LAB's Complaint*

The *in pari delicto* doctrine derives from the Latin, *in pari delicto potior est conditio defendentis:* " 'In case of equal or mutual fault … the position of the [defend-ing] party … is the better one.' " *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (*quoting* Black's Law Dictionary 711 (5th ed.1979)). The doctrine is based on the following two premises: "courts should not mediate disputes between wrongdoers, and denying judicial relief to a wrongdoer deters illegal conduct." *Granite I,* 194 B.R. at 328 (*citing Bateman Eichler,* 472 U.S. at 306, 105 S.Ct. 2622, and *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990)). It is "rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Pinter v. Dahl,* 486 U.S. 622, 632, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The Supreme Court in *Pinter* explained that *in pari delicto* bars claims of a plaintiff who is "an active, voluntary participant in the unlawful activity that is the subject of the suit. Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant." *Id.* at 635–36, 108 S.Ct. 2063 (citations and internal quotations omitted). In litigations arising under the federal regulatory statutes, in discussing the application of *in pari delicto,* the Supreme Court has required "at least substantially equal responsibility" on the part of the plaintiff. *See Bateman Eichler,* 472 U.S. at 310, 105 S.Ct. 2622.

As the Brokers represent, during the period in which the conduct alleged in the Complaint occurred, Askin, directly and through ACM, was the Funds' sole decisionmaker. *Cf. Granite I,* 194 B.R. at 331. Askin was the sole voting shareholder of Granite Corp. and Quartz and was the sole general partner of Granite Partners. *Id.* Thus whatever wrongful conduct the Brokers are alleged to have induced and participated in was consented to and participated in by the Funds. The Brokers claim that even accepting the allegations in Count I as true, the Funds themselves—acting through their managers, ACM and Askin—are equally at fault. Therefore, the principles underlying the doctrine of *in pari delicto* preclude the LAB from asserting a claim for inducing and participating in a breach of fiduciary duty against the Brokers.

The Funds were active and voluntary participants in the securities purchases about which they now complain. Acting through Askin and ACM, they were the central decisionmakers in the allegedly improper purchases they made. The Complaint states that "ACM and Askin repeatedly breached their fiduciary and contractual duties to the Funds to make investments with due care and in accordance with the Funds' stated investment objectives. ACM and Askin did not create market neutral ... portfolios ...; they did not use (or have) sophisticated computerized analytical techniques; they maintained inadequate liquidity; and they exposed the Funds to near-complete market— i.e., Broker—control." (Compl. ¶ 69.) It further states that "[a]s a result of ACM's and Askin's failure to manage the Funds with due care ... ACM and Askin failed to create a market neutral portfolio.... Rather, ACM and Askin created portfolios that were markedly and inappropriately tilted toward the bullish ... securities at a time when virtually all observers, including Askin, believed that interest rates soon would rise or were in fact rising." (*Id.* ¶ 71.)

The LAB, however, asserts that Askin and the Brokers were not of substantially equal fault since the Complaint alleges that Askin breached his duty of care by negligently buying inappropriate securities, whereas the Brokers *deliberately* took advantage of Askin's weaknesses and induced him to buy toxic waste that they knew to be inappropriate. Thus the LAB submits that Askin and ACM are alleged to be less culpable than the Brokers and not *pari* in their *delicto*. According to the LAB, application of the *in pari delicto* doctrine depends on proof that these factual allegations were wrong—*i.e.*, it depends on proof that Askin and ACM did, in fact, deliberately buy securities that they knew to be inappropriate for the Funds.

The LAB's "conclusory allegations of the legal status" of the acts of Askin and the Brokers, however, "need not be accepted as true for the purposes of ruling on a motion to dismiss." *In re American Express*, 39 F.3d at 400–01 n. 3; *see Cohen*, 906 F.Supp. at 961. Also, as stated in *Granite I*, "[i]t is true that in many of the *in pari delicto* cases, the trustee filed the complaint detailing the insider's wrongdoing, and the Court could determine from the trustee's own allegations whether *in pari delicto* applied." [18] *Granite I*, 194 B.R. at 330; *see, e.g., Hirsch*, 72 F.3d at 1092; *In re Mediators, Inc.*, 190 B.R. 515, 520 (Bankr.S.D.N.Y.1995), *aff'd*, 105 F.3d 822 (2d Cir.1997).

Indeed, the LAB's factual allegations concerning ACM and Askin's conduct in breaching their fiduciary duties do not sound in negligence. For example, the LAB alleges that ACM and Askin "had committed themselves to making extensive use of proprietary computerized models to analyze CMOs." (Compl. ¶ 67.) According to the LAB, ACM and Askin breached their fiduciary duties in that "they did not use (or have) sophisticated analytical techniques," (*id.* ¶ 69), "ACM and Askin in fact had no proprietary, computerized tools with which to model CMOs," and "often made purchase decisions based on little or no analysis or research." (*Id.* ¶ 70.) This is the language of deliberate misrepresentation, not negligence. It is difficult to interpret an allegation that Askin and ACM "committed" themselves to using a computer model, then bought billions of dollars of CMOs without having one, as anything but intentional conduct.[19] Additionally, the LAB establishes that ACM and Askin were responsible for forming and managing the

---

**18.** It is appropriate to resolve this issue on a motion to dismiss if, as the Brokers contend, the LAB's pleading alleges that Askin and ACM, the Funds' sole decisionmakers, and the Brokers were equal wrongdoers as a matter of law. *See Ross*, 904 F.2d at 826; *In re Haven Indus., Inc.*, 462 F.Supp. 172, 180 (S.D.N.Y.1978).

**19.** It is the same intentional conduct that formed the basis for Judge Bernstein's finding that the Funds' Trustee was barred from pursuing a claim on behalf of the Funds' debtor estates for inducing and participating in a breach of fiduciary duty against the broker-dealers because the Funds were *in pari delicto* with them. *See Granite I*, 194 B.R. at 330.

Contrary to the LAB's contention, Askin and ACM need not only have deliberately bought inappropriate securities to have engaged in intentional wrongdoing such that *in pari delicto* may be applied. The factual allegations concerning the computer models, for example, smell of fraud.

Funds' portfolios and that "ACM and Askin *created* portfolios that were markedly and inappropriately tilted toward bullish ... securities." (Compl. ¶ 71 (emphasis added).); *cf. Pinter,* 486 U.S. at 633, 108 S.Ct. 2063 (stating that the *in pari delicto* doctrine is not limited to situations "when the plaintiff's fault is intentional or willful"). Any attempt to claim that Askin and ACM were not central to the alleged wrongdoing is contradicted by the factual allegations the Complaint sets forth.

Because the factual allegations demonstrate substantially equal fault between the Funds—acting through Askin and ACM—and the Brokers, the doctrine of *in pari delicto* bars the claim.[20]

### C. *In Pari Delicto Is Applicable to the LAB's Claim*

██ The LAB also proposes that the doctrine is inapplicable to a bankruptcy trustee or his successor, in this case the LAB. This contention, however, is based on decisions from other jurisdictions and is contrary to the prevailing law of this circuit.

The Second Circuit decisions that the LAB does cite address actions by trustees exercising special avoidance powers under the Bankruptcy Code to recover estate property from transferees. By contrast, the present case seeks ordinary damages from the alleged wrongdoing and has been recognized as the type of case in which the *in pari delicto* may apply. *See Primavera,* 1996 WL 494904, at *12; *Granite I,* 194 B.R. at 328.

Indeed, in his decision in *Granite I,* Judge Bernstein showed no hesitation in explaining how *in pari delicto* would apply to the Trustee's ability to bring claims against broker-dealers, including the Brokers here. Significantly, Judge Bernstein noted that the LAB's predecessor, the Trustee, made "several arguments why *in pari delicto* does not

apply here." *Id.* at 330. Judge Bernstein rejected those arguments, finding that allegations of the broker-dealers' complicity in ACM and Askin's wrongdoing fall within the *in pari delicto* doctrine. This Court embraced Judge Bernstein's explanation in *Primavera,* 1996 WL 494904, at *12.

### IX. *Count XX Against DLJ for Equitable Subordination Is Dismissed*

██ Analogous to the defense of *in pari delicto,* the doctrine of "unclean hands" bars recovery by the LAB in equity. The doctrine of clean hands is an "established and salutary tenet of equity practice" based on the principle that "[o]ne who seeks equity must do equity." *In re Mediators,* 190 B.R. at 530. Under New York law, a court may decline to exercise its equitable powers in favor of a party whose " 'unconscionable act ... has immediate and necessary relation to the matter that he seeks in respect of the matter in litigation.' " *Aris–Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.,* 792 F.Supp. 969, 969 (S.D.N.Y.1992) (*quoting Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933)).

In *In re Mediators,* the plaintiff debtor corporation, through a committee of unsecured creditors, sought to recover fees paid by the corporation to its attorneys and bank, claiming that these defendants had been unjustly enriched because they assisted in defrauding the corporation. *In re Mediators,* 190 B.R. at 529. The court dismissed the unjust enrichment claim, holding that, because the corporation's sole shareholder and decisionmaker had engineered the fraud, the corporation's hands were also "filthy with fraud," and thus it was barred from obtaining equitable relief. *Id.* at 530.

---

**20.** It is useful to note that to succeed in an inducing and participating in a breach of fiduciary duty claim, a requirement of "knowledge" is sufficient. The factual allegations in the Complaint demonstrate as much regarding Askin and ACM.

According to Merrill Lynch, it seems illogical to claim that a defendant's culpability for inducing and participating in a breach of fiduciary

duty can ever be greater than that of the fiduciary himself. As the Supreme Court stated in *Bateman Eichler,* which is cited by the LAB, "we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to the liability in the first place." 472 U.S. at 313, 105 S.Ct. 2622 (speaking in the context of insider trading).

■ Here, the LAB acknowledges that the Funds, through Askin and ACM, invested in inappropriate securities, failed to use proprietary computerized models to analyze the securities they purchased, did not continuously monitor their portfolios, and did not maintain sufficient liquidity in their portfolios. The factual allegations support that the Funds knowingly engaged in these acts, through Askin and ACM, despite contrary representations to their investors. This conduct by the Funds is intrinsically related to the claims for which the LAB seeks to recover from DLJ. Accordingly, the equitable subordination claim is dismissed.[21]

### X. The Brokers' Motion to Dismiss the Unjust Enrichment Claim in Count XVII Is Granted

■ In Count XVII of the Complaint, the LAB alleges that the Brokers were unjustly enriched through their receipt of monies from four transactions: (1) "profits, fees, commissions, bonuses, interest, and other compensation" from its sale of inappropriate CMOs to the Funds; (2) "by deeming sales of the Funds' securities" to themselves at prices "substantially below their fair market value"; (3) "profits, fees, commissions, bonuses, interest, and other compensation" from their sales of other CMOs to other customers allegedly made possible by the Funds' purchase of the "deal driver" CMOs; and (4) short sale profits after artificially depressing the CMO market by its "collusive, rigged liquidations" of the Funds' securities. (Compl. ¶¶ 271–72.)

■ To state a claim for unjust enrichment, a plaintiff must allege that the

defendant was enriched at the plaintiff's expense and that the circumstances are such that equity and good conscience require that the defendant make restitution. *See ABF Capital*, 957 F.Supp. at 1333; *Violette v. Armonk Assocs., L.P.*, 872 F.Supp. 1279, 1282 (S.D.N.Y.1995). Unjust enrichment is a quasi-contractual remedy, so that such a claim is ordinarily unavailable when a valid and enforceable written contract governing the same subject matter exists. *See ABF Capital*, 957 F.Supp. at 1333–34; *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190, 193, 521 N.Y.S.2d 653, 656 (1987). This is true whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract. *See ABF Capital*, 957 F.Supp. at 1334; *Graystone Materials, Inc. v. Pyramid Champlain Co.*, 198 A.D.2d 740, 604 N.Y.S.2d 295, 296 (3d Dep't 1993); *Metropolitan Elec. Mfg. Co. v. Herbert Constr. Co.*, 183 A.D.2d 758, 583 N.Y.S.2d 497, 498 (2d Dept.1992).

Here, the Complaint represents that the transactions and repurchase agreements between the Brokers and the Funds were governed by written agreements. Because both the sales of securities to the Funds and the liquidation of those securities were done pursuant to contracts, namely the PSA and transaction confirmations, the unjust enrichment claim may not lie.[22] *See, e.g., Clark–Fitzpatrick*, 70 N.Y.2d at 388, 516 N.E.2d at 193, 521 N.Y.S.2d at 656; *A.H.A. General Constr., Inc. v. New York City Housing Auth.*, 241 A.D.2d 428, 661 N.Y.S.2d 213, 216 (1st Dep't 1997), *rev'd on other grounds*, 1998 WL 305439 (N.Y. June 11, 1998).

---

21. The "unclean hands" doctrine also provides grounds for dismissing the other claims through which the LAB seeks equitable relief: unjust enrichment and innocent representation, for example. As discussed above, the innocent representation claim is also barred by the Martin Act (as well as failure to plead justifiable reliance), and, as discussed below, the unjust enrichment claim is precluded due to the existence of written contracts.

22. Indeed, the LAB alleges three causes of action against the Brokers for breach of contract, claiming that the Brokers breached contractual obligations to the Funds by "improperly calculating the margin positions in the Funds' accounts,"

(Count IV), by liquidating the Funds' securities "at prices substantially below fair market value," by "failing to give the Funds credit for repoed securities in an amount equal to the price therefore obtained from a generally recognized source or the most recent closing bid quotation from such a source, within the meaning of the PSA Agreement," (Count X), and "by failing to pay the Funds more than $4 million of principal and interest payments due the Funds, and/or by improperly applying such principal and interest payments to alleged deficiencies in the Funds' accounts that resulted from the liquidations of the Funds' securities," (Count XVIII).

While the LAB does not meaningfully oppose the opposition against the unjust enrichment claim based on profits derived from allegedly wrongful margin calls and commercially unreasonable liquidations, it maintains that the allegations regarding the sale of inappropriate CMOs to the Funds is viable. According to the LAB, the Brokers profited from their sale of inappropriate CMOs to the Funds in two ways: First, they received large markups and other fees directly from the Funds as payment for the toxic securities. Second, because the securities that the Funds bought were the "deal driver" tranches of the Brokers' CMO offerings—the riskiest securities that had to be sold, or preferably pre-sold, to make the entire offering economically feasible—their sale to the Funds allowed the Brokers to market the balance of each offering to their other customers, also at a substantial profit.

The LAB contends that the claim that the Brokers sold the Funds toxic CMOs that they knew were inappropriate is outside the scope of any contract between the Brokers and the Funds because the Complaint does not allege that the Brokers breached any contract by selling inappropriate toxic CMOs to the Funds. However, such a narrow characterization of the allegations set forth in the Complaint is not entirely forthright. The amounts paid by the Funds for the "inappropriate" CMOs were in every case at the heart of the contractual agreements governing those transactions. The enrichment which was allegedly "unjust" was simply the payment of a bargained-for sales price for the securities which were in fact delivered to the Funds, and the LAB does not allege otherwise. The law is clear that the payments made pursuant to the express terms of a contract cannot be recovered via unjust enrichment theory. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 767 F.Supp. 1269, 1284 (S.D.N.Y.1991) ("Bargained-for benefits cannot be deemed to unjustly enrich a contracting party" (*citing City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 48 (2d Cir.1988) (noting that quasi-contractual relief unavailable where an express contract covers the subject matter))), *aff'd in part and rev'd in part on other grounds,* 970 F.2d 1138 (2d Cir.1992), *aff'd,*

510 U.S. 86, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993).

Additionally, as alleged in the Complaint, ACM and Askin were bound by both fiduciary and contractual duties to, *inter alia,* make investments in accordance with the Funds' stated investment objectives. Part of ACM and Askin's duties were to purchase appropriate—or bearish—securities for the Funds. The Complaint further maintains that the Brokers allegedly sold bullish securities to the Funds, in breach of the investment objective requiring the bearish securities. It is undisputed that the transaction confirmations issued the agreement between the parties with respect to any particular purchase. The LAB is on unsteady ground in contending that the agreements between the Funds and the Brokers regarding the purchase and sale of CMOs memorialized in transaction confirmations did not encompass the type and characteristics of the CMOs sold.

In support for its contention, the LAB cites to this Court's decision in *Violette,* 872 F.Supp. at 1282, in which an unjust enrichment claim was sustained despite the existence of contracts between the parties because the "agreements [did] not expressly address" the matter about which the plaintiff complained. The case is distinguishable, however, because unlike the instant case *Violette* is a *quantum meruit* case. In *Violette,* this Court held that quasi-contract principles dictated that a worker's compensation insurer pay legal fees out of its portion of settlement proceeds negotiated by the employee's attorneys, despite the settlement agreement's silence on the subject of attorneys' fees. *Id. Violette*'s holding that the attorneys were entitled to payment for their work does not support the LAB's assertion that it should recover in quasi-contract the payment price of the securities purchased by the Funds.

The sale of and profits made from inappropriate CMOs are covered by the contract between ACM and the Funds and agreements between the Brokers and the Funds. The written agreements governing the substance of the instant claim preclude recovery

under the quasi-contractual theory of unjust enrichment.

■■■ Furthermore, the last two grounds for the LAB's unjust enrichment claim—namely, monies the Brokers received from sales of CMOs to customers other than the Funds and receipt of profits from "short sales of Treasury and mortgage-backed securities" before and during the liquidation, (Compl. ¶¶ 271–73)—are dismissed for failure to adequately allege enrichment at the Funds' expense.

■■■ A defendant is enriched at the expense of a plaintiff when the defendant receives a benefit of money or property belonging to the plaintiff. *See Ammar Textiles (Pvt) Ltd. v. Contitrade Servs. Corp.*, No. 93 Civ. 237, 1994 WL 115993, at *3 (S.D.N.Y. Mar. 30, 1994). The Funds had no right to the Brokers' profits from sales of CMOs to other customers, nor did the Funds have any right to proceeds allegedly received by the Brokers from short sales of their own accounts of Treasury and other mortgage-backed securities. Accordingly, the LAB's unjust enrichment claim is dismissed.

## XI. *The Remaining Claims Subject to This Motion*

The Brokers also moved to dismiss the claims for rescission of unauthorized trades; breach of duty due to wrongful margin calls and liquidation; conversion; *prima facie* tort against Bear Stearns; breach of express warranty; and tortious interference with contract between the Trustee and Gifford Fong, against Merrill Lynch. The LAB concedes that these counts are to a large extent duplicative of other causes of action asserted in the Complaint and has therefore not provided meaningful opposition to the Brokers' motion for dismissal. After careful review, the Court finds that the reasons the Brokers' have provided in support of their motion to dismiss those claims have merit. Therefore, the claims above are hereby dismissed.

### *Conclusion*

For the reasons set forth above, the Brokers' motion for partial dismissal of the Complaint is granted in part and denied in part.

The LAB is granted leave to replead within 20 days of this decision.

Specifically, the Brokers' motion to dismiss the claims for inducing and participating in a breach of fiduciary duty (Count I), tortious interference with contracts (Counts II, XII, and XXI), rescission of unauthorized trades (Count III), breach of duty due to wrongful margin calls and liquidation (Count V), conversion (Count VI), violations of the Sherman and Donnelly Acts (Counts VII and VIII, respectively), *prima facie* tort against Bear Stearns (Count IX), common law fraud (Count XIII), negligent and innocent misrepresentation (Counts XIV and XV, respectively), breach of express warranty (Count XVI), unjust enrichment (Count XVII), and equitable subordination against DLJ (Count XX) is hereby granted.

The Brokers' motion to dismiss the claim for breach of duty to liquidate in a commercially reasonable manner (Count XI) is granted as to Bear Stearns and DLJ but denied as to Merrill Lynch.

The motion to dismiss the breach of contract claim for commercial unreasonable liquidations (Count X) is hereby denied, but the claim is to be modified as directed herein.

It is so ordered.